Ronald CANTOR, Ivan Snyder and James A. Scarpone, as Trustees of the Mafco Litigation Trust, Plaintiffs,

v.

Ronald O. PERELMAN, Mafco Holdings, Inc., Macandrews & Forbes Holdings, Inc., Andrews Group, Inc., William C. Bevins, and Donald G. Drapkin, Defendants.

No. C.A.97–586 MPT.

United States District Court,
D. Delaware.

Dec. 9, 2002.

Lawrence C. Ashby, Esquire, and Philip Trainer, Jr., Esquire, Ashby & Geddes, Wilmington, for Plaintiffs.

Anthony W. Clark, Esquire, Paul J. Lockwood, Esquire, and Patrick W. Straub, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, for Defendants.

*MEMORANDUM*

THYNGE, United States Magistrate Judge.

## I. Introduction

In this case, plaintiffs, the trustees of the MAFACO litigation trust,[1] allege breach fiduciary duties against Ronald O. Perelman, William C. Bevins, Donald G. Drapkin, Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc., and Andrews Group Incorporated for their involvement in a series of note transactions. Presently before the court are the parties' cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs move on their claims against Perelman only, for his actions in two of the note transactions. Defendants move for summary judgment on each of plaintiffs' claims against all of the defendants. For the reasons discussed, the court will deny plaintiffs' motion and grant defendants' motion for summary judgment in part.

1. Marvel initiated this suit in late 1997. The MAFCO litigation trust was established in Marvel's Chapter 11 reorganization plan, approved by the Bankruptcy court in 1998. The trustees filed a motion to amend the complaint seeking to be substituted for Marvel which was granted in late 1999. In September of last year, the plaintiffs filed a second motion to amend which was granted in January of this year.

2. At the time of its bankruptcy, Marvel was also involved in the sports trading card industry.

3. Perelman owned these entities either directly or indirectly. In *LaSalle National Bank v.*

## II. Background

Since 1933, Marvel Entertainment Group ("Marvel") has produced comic books which featured popular characters, such as, Spiderman and the Incredible Hulk.[2] Through one of his holding companies Perelman purchased Marvel from New World Entertainment in 1989. Seven years later, in 1996, Marvel filed for bankruptcy.

In order to understand the issues in this case, a discussion of the relationship between Marvel, the defendants, and Perelman's other holding companies is necessary. Marvel Holdings Inc. ("Holdings"), Marvel Parent Holdings Inc. ("Parent"), and Marvel III Holdings Inc. ("Marvel III") (collectively "Marvel holding companies") were three companies Perelman created to hold the Marvel stock that he purchased form New World Entertainment. Perelman also owned Andrews Group Incorporated ("Andrews"), MacAndrews & Forbes Holdings Inc. ("MacAndrews") and Mafco Holdings Inc. ("Mafco").[3] These latter companies owned each of the Marvel Holding companies. Perelman, Bevins, and Drapkin were board members and directors of MacAndrews, Andrews and Mafco, and constituted a majority of the boards for directors of each of those companies.

*Perelman, et al.,* 82 F.Supp 2d 279, 282 (D.Del.2000), a related case, Judge McKelvie explained the Perelman corporate structure as follows: "Perelman owns and controls a complex corporate hierarchy that includes the Parent Companies and the Marvel Holding Companies. Each corporation within the hierarchy owns 100% of the common stock of its immediate subsidiary. Perelmean owns 100% of Mafco; Mafco owns 100% of MacAndrews; MacAndrews owns 100% of Andrews; Andrews owns 100% of Four Star; Four Star owns 100% of Marvel III; Marvel III owns 100% of Parent; and Parent owns 100% of Holdings." (citations omitted).

The controversy in this case surrounds three note transactions between the Marvel Holding companies and a number of investment banks ("the noteholders"). In 1993, Holdings and Parent, acting at the direction of Perelman, issued notes to the banks, secured by the assets of these companies, which ultimately consisted only of Marvel stock. In the note agreements, Holdings and Parent agreed to certain restrictions against Marvel, who was not a party to the transactions. The restrictions included limitations on Marvel's ability to engage in debt and equity financing. The proceeds from the Holdings transaction were distributed as a dividend to Parent.[4] The proceeds of the Parent transaction were paid as a dividend upward in Perelman's chain of companies.

In 1994, Marvel III entered into a similar transaction with the noteholders. The proceeds of that transaction were also paid as a dividend to Perelman's other companies. It is undisputed that Marvel did not receive the proceeds from any of the note transactions.

Also challenged in this litigation are Marvel's licensing practices. In September 1994 Marvel began using accrual accounting in its licensing department.[5] During that time, when securing licensing agreements, Marvel employees would reach an agreement with the licensee without discussing many of the details of the license agreement. However, the parties agreed upon at least one detail, the guaranteed minimum royalty payment, which was included in most, if not all, of Marvel agreements. After discussing the guaranteed royalties, Marvel employees would fax the signature page of a licensing contract to the licensee to sign and return. Upon receipt of the signature page, Marvel reported the guaranteed minimum royalty as income pursuant to the accrual accounting method.

In 1994 and 1995, plans were underway to release a major motion picture based on the Spiderman character, a trademark of Marvel. Many licensees were interested in the premier date of the movie, since its release would likely significantly increase the sales of merchandise depicting Spiderman. Plaintiffs claim that Marvel employees consistently misrepresented the release date of the movie in order to induce the licensees to agree to a guaranteed minimum royalty payment, and thereby enable Marvel to meet its quarterly financial goals. Specifically, plaintiffs point to three transactions involving Acclaim, S. Goldberg, and Classic Heroes, which are discussed later herein.

Marvel began to experience serious financial difficulties resulting from a downturn in the comic book industry, and was in need of financing by the mid–1990's. These difficulties brought it in violation of certain covenants in the credit agreements, so Marvel sought a financial restructuring plan by the end of 1996.

Through Andrews, Perelman designed a restructuring plan for Marvel, and made the "Andrews Proposal" to the Marvel Board. Under the Andrews Proposal,

---

4. Parent used the proceeds to complete a tender offer of outstanding Marvel stock, which brought Perelman's indirect ownership of Marvel stock to 80%.

5. Previously, Marvel used the cash accounting method, which calls for reporting income when it is received. Under the accrual method of accounting, income is reported when it is earned. The change in the accounting method occurred seven months after the last note offering, and was reviewed and blessed by Ernst & Young, Marvel's outside independent auditors. Ernst & Young also provided clean audit opinions for the years 1994–1996.

Marvel would merge with Toy Biz,[6] and Andrews would provide the new company with $350 million of capital in exchange for 80.1% of the outstanding stock. This proposal would alter the stock ownership of Marvel, and ultimately would dilute the value of the noteholders' collateral (the Marvel stock). An independent committee determined that the proposal was fair, and Marvel filed for Chapter 11, to enable implementation of the Andrew's Proposal. However, the Andrews Proposal was blocked in the bankruptcy proceedings by certain Marvel creditors and minority shareholders.

## II. Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should not be granted if the dispute involves a material fact.[7] "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 citations in original). There is a genuine issue of fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (citations omitted). Additionally, summary judgment is appro-

priate "against a party who fails to make a showing sufficient to establish the existence of an [essential element]...on which that party will bear the burden of proof at trial...since a complete failure of proof concerning an essential element of [that]...party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. A moving party can meet its burden if the party "point[s] out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. On the other hand, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but...must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 321, 106 S.Ct. 2548 (citing *Catrett v. Johns–Manville Sales Corp.*, 756 F.2d 181, 184 (1985)).

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251, 106 S.Ct. 2505. In deciding a motion, the court should apply the evidentiary standard of the underlying

---

**6.** Toy Biz produced toys depicting Marvel characters. At one time, Marvel owned 46% of Toy Biz.

**7.** "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson et al. v. Liberty Lobby, Inc., et. al.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

cause of action. *Id.* at 251–52, 106 S.Ct. 2505.

> In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed...The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.

*Id.* at 251, 106 S.Ct. 2505.

> A cross motion for summary judgment is a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Transportes Ferreos de Venezuela II CA v. NKK Corporation, et al.,* 239 F.3d 555, 560 (3d Cir.2001) (citations omitted). Thus, when a court reviews cross motions for summary judgment, it must still "ascertain whether there is any genuine dispute as to a material fact." *Davies v. Paul Revere Life Insurance Co.,* 147 F. supp2d 347, 354 (M.D.Pa.2001).

## IV. Discussion

### A. Breach of Fiduciary Duty

#### 1. Restrictions in the Note Agreements

 Plaintiffs argue that Perelman breached his fiduciary duties to Marvel by conducting the Parent and the Marvel III note transactions.[8] According to plaintiffs, Perelman personally benefitted from the transactions by collecting $553.5 million in proceeds. Plaintiffs allege that the terms of the note agreements restricted Marvel's ability to *inter alia,* issue debt. Further, plaintiffs claim that without the restrictions required by the investment bankers, Perelman would not have been able to complete the transactions. *See D.I. 301 at 2.*

Plaintiffs argue that although Marvel was not a party to the note transactions, it was bound by the covenants relating to Marvel because Perelman controlled Marvel. Plaintiffs allege that Perelman would never have placed his holding companies in violation of the note agreements by causing Marvel to perform one of the restricted activities, even if it was in Marvel's best interest.[9] Therefore, Perelman breached his duty of loyalty by entering into a transaction which created a potential conflict of interest between Marvel's best interests and Perelman's bests interests. Further, plaintiffs claim that, despite their arguments to the contrary, defendants have previously admitted that Marvel was bound by the restrictions. In support, plaintiffs point to numerous SEC filings of Marvel and the Marvel holding companies.

Finally, plaintiffs claim that allowing Perelman to keep the proceeds of the transactions would result in his unjust enrichment, citing *Fulton National Bank v. Tate,* 363 F.2d 562, 571 (5th Cir.1966).

Defendants argue that Marvel was not bound by the restrictions because it was not a party to the note agreements and would not have been effected by any violation of the agreements. Instead, the defense explains, a violation of the restrictions was an "event of default" under the

---

8. Plaintiffs have not moved for summary judgment with regard to the Holdings transaction.

9. Perelman had indirect control of Marvel through his holding companies.

agreements, which caused liability for the Marvel holding companies, not Marvel. Defendants dispel plaintiffs' contentions that because Perelman had "absolute power" over Marvel, the restrictions were essent ally binding upon Marvel. *D.I. 288 at 29.* First, defendants note that through his holding companies, Perelman was the controlling shareholder of Marvel, and was restricted at all times by his fiduciary duties. Also, defendants maintain that the note transactions created a *potential* conflict which never materialized. Further, defendants assert that plaintiffs have no evidence that Perelman would have breached his duty of loyalty to Marvel if presented with such a situation. Therefore, according to defendants, they are entitled to summary judgment because plaintiffs have failed to overcome the presumption that a director has exercised independent judgment. *Id.*

In support, plaintiffs rely on *Fulton,* a case from the Fifth Circuit dealing with Georgia trust law which prohibited a fiduciary from placing himself in a situation which created a potential conflict. In *Bragger v. Budacz,* 1994 WL 698609, *4 (Del.Ch.1994), the Court of Chancery held that there was no per se rule prohibiting directors from having potentially conflicting interests.[10] Five years later, the Delaware Supreme Court determined that the strict fiduciary standards under trust law did not apply in corporate law. *Stegemeier v. Magness,* 728 A.2d 557, 562 (Del. 1999).[11] Thus, because *Fulton* was decided in the context of trust law, and is not from this jurisdiction, the court finds it inapplicable to the present facts. *Bragger,* however, is on point.

Under *Bragger,* to succeed on their claims, plaintiffs must prove that Perelman caused Marvel to take action which benefitted Perelman and harmed Marvel. Showing the ability or opportunity to take such action is not sufficient. Since Marvel was not a party to the note agreements, and did not attempt to perform or refrain from one of the prohibited acts, Perelman's potential conflicting loyalties be-

10. In *Bragger,* the shareholders of DOVatron, Inc. ("DOVatron") alleged that the directors of the company violated their fiduciary duties by nominating two employees of Dover Corp. ("Dover"), a competitor of DOVatron in some respects, to the DOVatron board of directors. *Bragger* at *1. DOVatron was initially a division of Dover. *Id.* Eventually, Dover made DOVatron a wholly owned subsidiary, and later spun it off, thus forfeiting all of its ownership of DOVatron. *Id.* at *2. While it was a wholly owned subsidiary, Dover established a board of directors consisting of employees involved in the management of both Dover and DOVatron. *Id.* After DOVatron was spun off, two of the board members continued as Dover employees. *Id.* In their complaint, the shareholders asserted that the other members of the DOVatron board violated their fiduciary duties by allowing the Dover employees to remain on the board, where they could obtain sensitive information which could give Dover a competitive edge over DOVatron. *Id.* The court held that Delaware law does not prohibit a director from one corporation from sitting on the board of another, even if there are conflicting interests. *Id.* at *4.

11. That case involved allegations of breach of fiduciary duties against a trustee. "The trial court incorrectly equated the standard of fiduciary duty of a corporate director with that of a trustee of a trust. The absolute prohibition under common law against self-dealing by a trustee has been modified in the corporate setting to offer a safe harbor for the directors of a corporation if the transaction is approved by a majority of disinterested directors. Transactions approved by the directors are therefore not voidable because there are interested directors, if a committee of disinterested directors approves the transaction. In such a case the directors are protected by the business judgment rule. If, however, the transaction is not approved by the requisite number of disinterested directors, the directors must prove that it is entirely fair." *Stegemeier* at 562.

tween Marvel and the holding companies never materialized and cannot form the basis of a breach of fiduciary duty claim.

However, plaintiffs argue that the restrictions in the note agreements prevented Marvel from restructuring its debt, and ultimately contributed to its bankruptcy. Defendants refute this, arguing that the highly restrictive covenants in Marvel's credit agreements prevented financial restructuring. Based on the evidence presented, the court finds that the covenants in the credit agreement were more restrictive than those in the note agreements. Thus, the restrictions imposed by the note agreements did not limit Marvel in the manner that plaintiffs contend. Plaintiffs further argue that after renegotiating with its creditors, Marvel was permitted to incur additional debt, but could not complete restructuring because of the stock ownership restrictions in the note agreements. Thus, plaintiffs contend, the note restrictions prevented financial restructuring.

Plaintiffs' argument would be persuasive if the Andrews Proposal had been implemented by the bankruptcy reorganization plan. As previously explained, adoption of the Andrews Proposal would have changed the stock ownership of Marvel, thereby causing an event of default under the note agreements. If Perelman was unable to obtain default waivers from the note holders, he would then have faced a situation involving conflicting loyalties: if he proceeded with the Andrews Proposal, he would place his holding companies in default on the note agreements; if he complied with the note restrictions, he would thereby breach his fiduciary duties by not acting in Marvel's best interests. However, the minority shareholders and creditors of Marvel unwittingly relieved Perelman of this potential dissonance by lobbying against the Andrews proposal. Therefore, since Perelman was never presented with

the aforementioned conflict, the restrictions in the notes never effected Marvel's ability to enter into certain transactions. As previously discussed, Delaware law permits fiduciaries to engage in interested transactions, and does not allow recovery for potential conflicts.

### 2. Inflation of Marvel's Stock

■ In their complaint, plaintiffs claim that in order to avoid bankrupting the Marvel holding companies, the defendants artificially inflated Marvel's revenues by utilizing questionable tactics in its licensing department, and thereby, misleadingly increased the value of Marvel stock. Defendants have moved for summary judgment on this claim. The court must analyze plaintiffs' allegations before discussing the merits of them.

Plaintiffs assert that defendants' motion is inappropriate because the licensing allegations are not a separate legal claim suitable for summary judgment. Rather, they are further evidence of defendants' failure to fulfill their fiduciaries duties to Marvel. Since the licensing allegations are evidence, rather than a distinct legal claim, plaintiffs maintain that defendants' summary judgment motion is actually an improper motion in liming to exclude evidence.

After reviewing the complaint, and applying all reasonable inferences therefrom, the court finds that the licensing allegations are not a separate legal claim. Plaintiffs have only alleged breach of fiduciary duty against defendants. However, the court disagrees with plaintiffs' argument that the defendants' summary judgment motion should be viewed as a motion in limine. Since plaintiffs have asserted breach of fiduciary duty against defendants, they must prove the manner in which defendants breached this duty to Marvel. Often in breach of fiduciary duty

cases, as in the present matter, a plaintiff claims that a defendant breached his duty in more than one way. When analyzing such allegations, the court must examine each set of facts as a separate basis for liability, and determine if those facts alone could prove a breach of fiduciary duty.[12] In the present case, plaintiffs' licensing allegations alone would support a basis for breach of fiduciary duty. Therefore, the court looks at the licensing allegations as a separate theory under plaintiffs' breach of fiduciary duty claim against defendants. Thus this theory, like plaintiffs' conflicting loyalty claims is appropriate for resolution on summary judgment. Since plaintiffs, the non-moving parties, have the burden of proof on this issue, the obligation rests with them to show that there is a genuine issue of material fact.

Plaintiffs contend that defendants inflated Marvel's value by engaging in improper licensing practices. According to plaintiffs, as the only asset of each holding company was ultimately the Marvel stock, a serious decline in the price of that stock would have significantly reduced the value of the holding companies. If Marvel's stock price dramatically declined, the holding companies' assets would be insufficient to pay the notes, leading to their bankruptcy. Plaintiffs further assert that bankruptcy for the holding companies would expose these companies, and ultimately Perelman, to fraudulent conveyance claims under the Bankruptcy Code, which would require Perelman to return the dividends (that is, the $553.5 million in note proceeds) if he were unsuccessful.[13] Plaintiffs explain that they are neither trying to assert nor prove the merits of such an argument. Rather, the mere fact that defendants were aware that such a claim was possible, show defendants', especially Perelman's, motive to inflate the earnings, and thus the value of Marvel stock. Under plaintiffs' theory if defendants kept the price of Marvel stock stable by inflating its licensing earnings, and the holding companies out of bankruptcy for a year after the dividends were paid, they would not be forced to return the dividends.[14] Plaintiffs contend that defendants could have avoided damage to Marvel, if they had employed sound management techniques, rather than manipulative schemes to maintain Marvel's revenues and stock value.

According to plaintiffs, Marvel's licensing department was a cash cow which produced high revenues with little related overhead.[15] Therefore, plaintiffs argue,

---

12. Of course, these claims must be supported by the appropriate evidence.

13. Under § 548, which deals with fraudulent conveyances, payments made by a debtor within one year prior to bankruptcy, must be returned to the estate for distribution among the debtor's creditors.

14. *See 11 U.S.C. § 548(a)(1)(B)(iii).* Plaintiffs assert that under the bankruptcy code such payments would be subject to avoidance by the bankruptcy trustee as either a preferential payment or a fraudulent conveyance. Defendants dispute this, arguing that 11 U.S.C. § 547, which addresses preferential payments, does not apply to dividends. Plaintiffs respond that under 11 U.S.C. § 548(a)(1)(B)(iii), a dividend may constitute a fraudulent conveyance. Defendants assert that the bankruptcy trustees of the holding companies and not plaintiffs would have standing to raise such claims. Plaintiffs argue that the substance of any legal claims which would have arisen had the holding companies filed for bankruptcy is irrelevant. Rather, they stress that Perelman faced a legal claim concerning the dividend payments, and thus, provides a motive for him to inflate the value of Marvel's stock.

15. *See D.I. 149 at ¶ 39.* According to Marvel's 1994 10–K filing, licensing revenues were $50 million, which equaled 10% of Marvel's total revenues. Plaintiffs contend that because of licensing's low overhead, that $50 million constituted the bulk of Marvel's net earnings which totaled $62 million in one year.

Marvel implemented a simplistic, three-step plan to inflate earnings through its licensing operations: "persuade a licensee to commit to pay a substantial guaranteed license fee (on the basis of misrepresentations or otherwise), book the entire guaranteed fee as income when the agreement was made, and then write it off (without bothering to sue the licensee) a year or two later when the licensee refuses to pay the guaranteed amount."

Plaintiffs allege that defendants accomplished this plan by: (1) booking revenue from license agreements before those agreements were final, (2) backdating license revenue agreements to "make" the goals set for each financial quarter, and (3) obtaining guaranteed minimum royalty payments from licensees by utilizing false and misleading promises.

According to plaintiffs, there was substantial pressure on employees to secure licensing agreements so that Marvel would meet its quarterly financial goals.[16] Marvel employees did this by reaching agreement on a guaranteed royalty amount with the licensee, but failing to complete other parts of the deal, and then persuading the licensee to sign the contract before the entire agreement was completed. Plaintiffs allege that in order to reach financial quarterly goals, employees did practically anything to secure a deal, especially toward the end of a quarter. Included in the employee tactics was misrepresenting

the release date of the Spiderman movie which artificially raised the value of the Marvel license, and induced the licensee to sign. Put simply, plaintiffs are alleging that Marvel was selling a dime for one dollar on the false representation that the dime was being taken out of circulation.

Plaintiffs contend that the licensees, who entered agreements on the basis of an employee's misrepresentation, later refused to pay the guaranteed royalties when no Spiderman movie was forthcoming. Further, plaintiffs assert that defendants failed to sue those licensees because defendants knew that the employees had secured the deal with false promises. Instead, defendants would write off the guaranteed royalties as losses in another financial quarter. Plaintiffs allege that the false promises inflated the value of Marvel's licenses (its income) which, in turn, created an artificially high stock price.

To illustrate defendants' misconduct, plaintiffs describe two 1994 transactions and one 1995 transaction in which Marvel secured a guaranteed minimum royalty, which it later wrote off. In the first transaction, Marvel licensed its characters to Acclaim Entertainment, Inc. ("Acclaim"), in exchange for a guaranteed royalty of $4.25 million. After Acclaim failed to pay the royalty, Marvel agreed to release Acclaim in exchange for $900,000.[17] The second transaction involved a similar licensing

---

**16.** From the evidence submitted, signs encouraging the employees to meet quarterly goals were posted around the Marvel offices and in the employee restrooms.

**17.** In their complaint plaintiffs cite, and apparently place significance on, the following comments made by Marvel's in-house counsel to the bankruptcy trustee, in a memo in 1998, approximately two years after Marvel filed for bankruptcy, and after the institution of this adversary proceeding: "Acclaim's position is that Marvel promised it anything to save its quarter and Marvel didn't deliver. To date,

none of the movies contemplated by the September 1994 agreement have been produced... The legend of the June and September deals [with Acclaim], however, is quite well known. Both deals were last minute, end of the quarter deals which were entered into to 'make' the respective quarters. Marvel touted TV shows and movies. Acclaim signed the agreements." *See D.I. 149 at ¶ 42.* Regardless of the accuracy of these comments, defendants enjoy the protection of the business judgment rule. *See infra.*

agreement with Classic Heroes. That agreement called for a $2.5 million minimum guaranteed royalty, plus possible additional guaranteed royalties if a movie utilizing one · of Marvel's characters was released. Marvel reported $6.5 million in revenue upon the signing of the agreement, and according to plaintiffs, subsequently wrote off the entire amount. Finally, plaintiffs allege that in the third transaction Marvel and S. Goldberg entered into a licensing agreement calling for a $2.0 million guaranteed royalty. They claim that S. Goldberg entered the deal based on misrepresentations by a Marvel employee that a Spiderman movie would be released within 18 months. Plaintiffs maintain that after paying $750,000 in advance and one payment of $200,000, S. Goldberg refused to pay the rest of the guarantee because it felt that Marvel made false promises regarding the Spiderman movie.[18] Moreover, plaintiffs claim that numerous other licensees of Marvel experienced similar treatment, but do not address any other specific transactions.

In support of their claims, plaintiffs cite a number of depositions involving former Marvel employees. The most relevant, was the deposition of a former licensing department manager, Nancyann Volpe. In her deposition Volpe testified that there was "pressure" to "make" quarters at Marvel, and indicated that employees consistently booked licensing revenues before an agreement was formed. Volpe also testified that the management was aware of this practice, but admitted that there was no company directive or policy on this.[19]

In their summary judgment motion, defendants primarily refute plaintiffs' arguments concerning defendants' motive for inflating the value of Marvel stock. They argue that plaintiffs are essentially challenging Marvel's accounting practices regarding the way in which Marvel reported its guaranteed royalties.[20] According to defendants, Marvel changed its licensing accounting methods from cash accounting to accrual accounting with the approval of its outside auditors, who also gave Marvel a clean audit report in 1994 and 1995. Further, defendants assert that because they relied on the expertise of its accountants, they are shielded from liability. Defendants rely on 8 Del. C. § 141(e) and *Ash v. McCall*, 2000 WL 1370341 for support.[21]

---

**18.** In their brief, plaintiffs reproduced the following comments from Helen Isaacson, Marvel's head of worldwide licensing: "Basically, they [S. Goldberg] believe they were raked over the goals and dramatically overpaid for their licence, *probably true* (guarantee is $2 mil and the deal was probably worth half.) . . . They were promised movie rights which were never included in their agreement and in fact were told the movies were imminent *should sound familiar." See D.I. 291 at 21* (emphasis in original). Again, even if these comments are accurate, defendants still enjoy the protection of the business judgment rule. *See infra.*

**19.** Plaintiffs also cite to the deposition of Joseph Calamari, who owned Marvel before selling it to New World, and then was president before Perelman bought the company. After Marvel declared bankruptcy, Calamari returned to Marvel as its President. He testified that there were numerous complaints about the licensing agreements, because of the non-occurrence of promised events, such as, television shows and movies. However, Calamari was not at Marvel during the time that the suspect licensing practices were utilized.

**20.** Defendants also claim that Perelman had no incentive to inflate Marvel's stock price, because from 1993 through June of 1996, Perelman purchased more than five million dollars of Marvel stock. Thus, they contend an inflated stock price would not have benefitted Perelman.

**21.** Defendants claim that plaintiffs only took the deposition of one licensing sales representative, Volpe, from the relevant period, who

Concerning the claims of misrepresentation, without stating so directly, defendants argue that in order to prove a breach of fiduciary duty to Marvel, plaintiffs would have to show that Marvel made false promises to its licensees to induce them to enter an agreement. Expounding upon this argument, defendants maintain that plaintiffs cannot prove fraud merely by showing that some employees made faulty predictions about the projected release date of a movie or television show. Further, plaintiffs have no substantiation of a company wide policy authorizing misrepresentations to obtain license agreements nor evidence of a lack of oversight by the board of directors. Without such proof, defendants' claim, plaintiffs cannot succeed on their arguments because the directors are not responsible for the actions of the company's employees unless they violated their corporate oversight responsibilities. Instead, plaintiffs must show a complete lack of oversight of Marvel's employees by management, or a company policy encouraging such conduct. Moreover, defendants note that plaintiffs present unreliable evidence relating to just three of Marvel's numerous licensing agreements. To evaluate whether these transactions were fraudulent, defendants contend that the challenged conduct must be judged at the time the transactions occurred. Hindsight showing that the transactions were unsuccessful is not sufficient to show fraud. Defendants implicitly argue that plaintiffs cannot prove defendants breached their duties to Marvel

without first showing that Marvel made false promises to its licensees. In support, defendants rely on *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del.Ch.1996).

Defendants directly address the Acclaim transaction and argue that plaintiffs mischaracterize the Acclaim facts. They rely on the deposition of Gregory Fischbach, the Chief Executive Officer of Acclaim, in support of their position. In his deposition, Fischbach testified that Marvel did not make misrepresentations when negotiating the licensing agreement. Further, he stated that Acclaim was experiencing financial difficulty when the guaranteed royalty came due, and that "we were the guy trying to get out from under a bad deal. So you use whatever you use in order to negotiate."[22]

Defendants briefly discuss the S. Goldberg and Classic Heroes agreements. According to defendants, employees of both companies admitted that the license agreement was not conditioned upon the release of the Spiderman movie.[23]

*Reliance Upon Accountants*

Under Del. C. § 141(e), board members are relieved from liability resulting from their actions if they "rel[ied] in good faith upon the records of the corporation and upon such information, opinions, reports, or statements presented to the corporation by . . . any other person as to matters the member reasonably believes are within such other person's professional or expert

---

testified that she was never told to book royalties by using misrepresentations.

**22.** *D.I. 306 at 9.* Additionally, Fischbach made the following comments concerning the Marvel deal: "And again, it states in the body of this thing that this was—all these films may or may not happen in paragraph 1. So, I mean, we did it kind of with open eyes." *Id.* at 8.

**23.** Defendants cite to the deposition of Val Formica, from S. Goldberg, who admitted that representations made, but not included in the final written agreement, were not part of the contract. Defendants also referenced Isaac Perlmutter's deposition. Perlmutter, from Classic Heroes, testified that he knew that the guaranteed royalty was not conditioned upon the Spiderman movie.

competence and who has been selected with reasonable care by or on behalf of the corporation." In *Ash v. McCall*, the Court of Chancery found that board members were entitled to rely upon the opinions of accountants regarding the financial stability of a corporation. That litigation was a derivative claim brought by the shareholders of McKesson HBOC Inc., which was created when McKesson Corporation ("McKesson") acquired HBOC & Co ("HBOC"). In that case, the shareholder plaintiffs alleged that the defendants, the directors and officers of both McKesson and HBOC, should have been aware that HBOC had been inflating its income for at least three years. Before completing the acquisition, McKesson hired DeLoitte & Touche to perform due diligence on HBOC, who failed to uncover any accounting problems. The court stated: "Directors of Delaware corporations quite properly *delegate* responsibility to qualified experts in a host of circumstances. One circumstance is surely due diligence review of a target company's books and records. To delegate this assignment is not an 'abdication' of duty." *9.

*Responsibility for Employees' Actions.*

Here, the Marvel board delegated the corporate accounting duties to Ernst & Young. Further, the board relied upon Ernst & Young expertise in accounting matters, such as the best method of accounting for Marvel's business. Lastly, Ernst & Young provided a clean accounting report to Marvel. As a result, the court finds that the Marvel board met its fiduciary duties with regard to accounting. Thus, the defendants' motion for summary judgment, relating to plaintiff's allegations of accounting abuses, is granted.

In most circumstances officers and directors are not responsible for the conduct of the corporation's employees, unless the directors have failed to oversee the opera-

tions of the company. In *Caremark*, the Court of Chancery addressed a director's oversight duties. In that case, shareholders brought a derivative action against the board of directors of Caremark International ("Caremark") for breach of the fiduciary duty of care.

Caremark was a patient and managed care provider which received most of its payments from third parties, such as, insurance companies. Caremark and its predecessor, Baxter International, Inc., had provided consulting services and gave research grants to physicians. Some of those physicians referred patients to Caremark. Such contracts were permissible under the law. However, the Anti–Referral Payments Law ("ARPL"), prohibited payments from health care providers to physicians or other parties for securing referrals. Since any payments from Caremark to a referring physician would raise suspicion, even if those payments were for consulting services, Caremark developed guidelines for contractual relationships, which included a directive prohibiting payments for patient referrals.

Caremark, which had operated under a decentralized management, began to centralize its management after the Health and Human Services and the Department of Justice launched investigations into Caremark's practices. Additionally, the board of directors implemented other procedures to ensure that Caremark was in compliance with state and federal laws.

Despite management's efforts, Caremark was indicted for violating the ARPL. After settling the criminal claims, Caremark entered into a settlement agreement with the shareholder plaintiffs. In *Caremark*, the Court of Chancery addressed the fairness of the settlement agreement which necessarily required a review of the merits of the case.

In their complaint, plaintiffs alleged that the directors of Caremark "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance."[24] The court explained a director may violate his duties in two contexts: rendering a negligent decision, or failing to act when the situation would require action.

According to the court, when a board of directors renders a decision, it enjoys the protection of the business judgment rule, as long as the decision was well reasoned. The court emphasized that the business judgment rule was process oriented, and does not allow for an evaluation of the content of the decision if it were made in good faith. A director makes a decision in good faith when he "exercises a good faith effort to be informed and to exercise appropriate judgment."

The *Caremark* decision stands for the proposition that, corporate directors, who must approve major corporate transactions, are not required to be intimately involved in routine daily business operations. Further, unless the board has reason to suspect wrongdoing, it will not be liable for an employee's misconduct. However, the court held that the board must implement an information and reporting system which "is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." Without such a system, the board, in theory, may be found liable for breach of fiduciary duty. According to the court, the board's lack of good faith in establishing a compliance program will be proven if there is "a sustained or systematic failure of the board to exercise oversight."

Under Caremark, the extent of a board of directors' oversight function is an appropriate inquiry when evaluating breach of fiduciary duty. If there is a complete lack of monitoring by the board, directors may be found liable for employee misconduct. Here, plaintiffs implicitly assert this lack of oversight by arguing that Perelman and the Marvel directors knew or should have known of the misrepresentations the employees continuously made to the licensees. Defendants refute this by claiming that there was no company-wide policy encouraging the alleged misrepresentations.

Neither party presented evidence on the relevant issue under *Caremark:* the extent of the board's oversight of the Marvel employees. Alleging that the board should have known of the employees' actions without further proof is not enough to support plaintiffs' summary judgment motion. Similarly, showing that no company policy *encouraged* misrepresentations is not dispositive of whether the board fulfilled its monitoring responsibilities under *Caremark.* Thus, such arguments do not support defendants' motion for summary judgment. Since neither party presented the necessary evidence, the court will not grant summary judgment for either party on this issue at this time.

## V. Conclusion

For the reasons stated herein, plaintiffs' motion for summary judgment (D.I.267) is DENIED, and defendant's motion for summary judgment (D.I.274) is GRANTED in part and DENIED in part.

---

**24.** Chancellor Allen noted that it is very difficult for plaintiffs to succeed when asserting such claims.

An order consistent with this memorandum will follow.

### ORDER

At Wilmington, Delaware, this 9th day of December, 2002, an Opinion dated December 9, 2002, having been issued and entered, therefore,

IT IS HEREBY ORDERED AND ADJUDGED that in light of the findings contained therein, defendant's Motion for Summary Judgment is GRANTED, in part and DENIED in part; and plaintiff's Motion for Summary Judgment is DENIED.