### In re BRIDGEPORT HOLDINGS, INC., et al., Debtors.

**Bridgeport Holdings Inc. Liquidating Trust, Plaintiff,**

v.

**Alfred D. Boyer, Bradford M. Freeman, William Johnson, Laurence Midler, Charles P. Rullman, Kashif F. Sheik, Gary L. Wilson, Jerome B. York and Lawrence Ramaekers, Defendants.**

Bankruptcy No. 03–12825(PJW).
Adversary No. 07–51798(PJW).

United States Bankruptcy Court,
D. Delaware.

May 30, 2008.

William P. Bowden, Benjamin W. Keenan, Ashby & Geddes, Wilmington, DE, Bennett J. Murphy, Jeanne E. Irving, Caroline Walters, Hennigan, Bennett & Dorman LLP, Los Angeles, CA, for Defendants, Alfred D. Boyer, Bradford M. Freeman, William Johnson, Laurence Midler, Charles P. Rullman, Kashif F. Sheik, Gary L. Wilson and Jerome B. York.

Mark Minuti, Jeremy W. Ryan, Candice Toll Aaron, Saul Ewing, Wilmington, DE, Sheldon S. Toll, Law Office of Sheldon S. Toll PLLC, Southfield, MI, for Lawrence J. Ramaekers.

William H. Sudell, Jr., Daniel B. Butz, Morris Nichols Arsht & Tunnell, Wilmington, DE, Michael Stamer, Robert Johnson, Jamie Berger, Elizabeth Raskin, Brian Carney, Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Bridgeport Holdings Inc. Liquidating Trust.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to Defendants' motions (Doc. ## 16 and 17) to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(c) and Federal Rule of Bankruptcy Procedure 7012. For the reasons set forth below, I will deny the motions in part and will grant them in part.[1]

## BACKGROUND

On September 10, 2003, Bridgeport Holdings Inc. and its domestic affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors traded under the name "Micro Warehouse".[2] On September 24, 2004, this Court entered an order confirming the Plan of Distribution. Pursuant to the terms of the Plan, the Liquidating Trustee, on behalf of all beneficiaries of the Trust (the "Trust"), has been assigned all of the Debtors' causes of action under §§ 542, 543, 544, 547 through 551 and 553 of the Bankruptcy Code.

On September 9, 2003, one day prior to the petition date, the Debtors consummated the sale of a substantial portion of their United States assets (the "Assets") to CDW Corporation ("CDW"), including the majority of the Debtors' inventory and substantially all of their intellectual property, information technology hardware assets and furniture and equipment located at certain of the Company's office locations. The purchase price paid by CDW for the Assets was $28,000,000.[3]

On March 3, 2005, the Trust commenced an adversary proceeding against CDW in this Court seeking to avoid the sale transaction as a fraudulent transfer under § 548(a)(1) of the Bankruptcy Code and in accordance with the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*, made applicable by § 544 of the Bankruptcy Code. After extensive discovery and motion practice, the fraudulent transfer action was settled by an order entered on February 22, 2007, pursuant to

---

1. The motions are: Motion of Defendant, Lawrence J. Ramaekers, to dismiss complaint pursuant to Fed. R. Bankr.P. 7012(b)(6)(Doc. # 16) and Motion of Defendants Alfred D. Boyer, Bradford Freeman, William Johnson, Laurence Midler, Charles P. Rullman, Kashif F. Sheikh, Gary L. Wilson, and Jerome B. York to dismiss Counts I, II, III, IV and VI of the complaint (Doc. # 17).

2. This opinion will sometimes refer to Micro Warehouse entities as the "Company."

3. CDW also purchased certain Canadian assets of the Company for $2,000,000. The Company's European business was sold later, during the chapter 11 case, for $57,300,000.

which CDW tendered the Trust a lump sum payment of $25,000,000. Obviously, this was not a nuisance settlement.

On December 11, 2007 the Trust filed the subject Complaint against officers and directors of Micro Warehouse (the "D & O Defendants") and Lawrence J. Ramaekers ("Ramaekers"). The Complaint alleges that the D & O Defendants and Ramaekers breached their fiduciary duties to the Company, the shareholders and its creditors for acts and omissions which culminated in the rushed "fire sale" of the Assets to CDW on September 9, 2003. Specifically, Count I alleges breach of fiduciary duty of loyalty and lack of good faith against all defendants other than Ramaekers, Count II alleges breach of fiduciary duty of care and lack of good faith against all of the defendants except Ramaekers, Count III alleges breach of fiduciary duty and lack of good faith against four individuals to the extent they served as officers only, Count IV alleges breach of fiduciary duty of care and lack of good faith by defendant Midler to the extent he served as an officer only, Count V alleges breach of fiduciary duty of care, loyalty and lack of good faith by Ramaekers, and Count VI alleges corporate waste by all defendants.

The following facts are distilled from the allegations in the Complaint. (Doc. # 1)(hereinafter the "Complaint").

**Industry's Financial Distress**

In or about January 2000, at the height of the dot-com boom, Micro Warehouse was acquired by a group of investors in a leveraged buyout ("LBO"). In the LBO, Micro Warehouse became indebted to a syndicate of eighteen (18) financial institutions (the "Secured Lenders") led by CS First Boston ("CSFB") as agent, pursuant to a Credit Agreement dated as of January 31, 2000 (the "Credit Agreement"). Approximately one year after the LBO, the technology sector suffered a significant downturn due to the bursting of the dot-com bubble and the lull in technology spending following "Y2K" upgrades. There was a further decrease in consumer demand following the terrorist attacks of September 11, 2001. This recession resulted in an erosion in Micro Warehouse's sales. The recession, coupled with Micro Warehouse's debt load, resulted in a degradation of Micro Warehouse's financial outlook. As a result, Micro Warehouse was forced to negotiate amendments to the Credit Agreement at the end of 2000, leading to the execution of an Amended and Restated Credit Agreement dated December 15, 2000 (the "Amended Credit Agreement"). Micro Warehouse's financial problems continued, and in early 2002 Micro Warehouse had defaulted on one or more of its loan covenants. The Company was again forced to renegotiate its credit facility with the Secured Lenders, leading to the execution of Amendment No. 1, Waiver and Agreement to the Amended Credit Agreement, dated January 11, 2002.

**The D & O Defendants Ignore Micro Warehouse's Financial Condition**

Following the amendment of Micro Warehouse's loan agreements, the D & O Defendants were faced with various options that would have improved the financial performance of Micro Warehouse, including (i) a new private equity investment; (ii) a business combination with a competitor; and (iii) a debt restructuring with an asset-based lender. Nevertheless, the D & O Defendants failed to follow through with any of these recognized options to improve the Company's financial condition, so that the Company's financial decline continued throughout 2002. A presentation from an October 29, 2002 shareholder meeting reveals that by that date, the D & O Defendants had identified the following "M & A Alternatives": (i) "Potential Merger," (ii) "Poten-

tial Joint Ventures," and (iii) "Potential Asset Sales." At that time, however, the D & O Defendants failed to engage the Company in any of these alternatives identified to improve the Company's financial condition. By the fall of 2002, the Company was suffering from liquidity difficulties, and the D & O Defendants knew that the Company would default on its EBITDA covenant at the coming year end. Around the same time, key vendors began to restrict Micro Warehouse's lines of credit.

During the prosecution of the Trust's fraudulent conveyance action against CDW, Stephen Yankauer ("Yankauer") of CSFB gave testimony that in October 2002, concerns about the Company's liquidity were "severe and significant" and the Secured Lenders were concerned about the possibility of a "free fall" bankruptcy. Yankauer further testified that he considered the loan to be "upside down," meaning that the Company owed more on the loan that the security was worth, from both a going-concern and liquidation perspective. Yankauer described Micro Warehouse's suppliers as "watching [the Company] like a hawk." Canadian Imperial Bank of Commerce ("CIBC"), another of the Secured Lenders, classified Micro Warehouse as having a "very weak financial condition" and its loan as "non-performing." CIBC was "very skeptical" of the Company's ability to survive at that time.

Between December 2002 and March 2003, Micro Warehouse remained in breach of its EBITDA loan covenant, and had also failed to make the required principal payments on its term loans. Accordingly, the D & O Directors were ultimately forced to obtain four separate, short-term covenant waivers from the Secured Lenders through the fourth quarter of 2002 and the first quarter of 2003. Meanwhile, Mi-

cro Warehouse and the Secured Lenders negotiated a restructuring of the secured debt facility, which closed on April 11, 2003. Despite the restructuring of its debt, however, Micro Warehouse's downward spiral continued through the spring and mid-summer of 2003, as its key vendors further restricted its lines of credit.

In early June 2003 the Secured Lenders urged Micro Warehouse to hire a restructuring advisor. For approximately two months, however, the D & O Defendants ignored their responsibilities to the Company and its shareholders to act in their best interest, and failed to do so. Meanwhile, Micro Warehouse's financial condition worsened. By July 2003, it was very difficult for Micro Warehouse to obtain products to timely fill customer orders, and key salespeople began leaving Micro Warehouse to join competitors. As they watched key salespeople flee to competitors, the D & O Defendants continued to sit on their hands and disregard their responsibilities to act in the best interest of the Company and its shareholders. Among other things, in the face of the Company's dire financial condition, the D & O Defendants failed to contact the Company's competitors who had previously expressed interest in a transaction with the Company, to discuss whether they would be interested in purchasing the Company's United States business.

On or about July 18, 2003, the Company met with its Secured Lenders to discuss the Company's financial condition. During this meeting, the D & O Defendants again disregarded the financial "red flags" and painted an unjustifiably rosy picture of the Company's future. As late as July 25, 2003, the Company told its Secured Lenders that it expected the Company to have "strong profitability and cash flow in the second half of [2003]." Minutes from an August 5, 2003 meeting of Micro Ware-

house's board of directors show that, by that date, one of Micro Warehouse's largest vendors had reduced Micro Warehouse's credit line by $11,000,000, and that Micro Warehouse was engaging in a process of holding back checks to vendors due to insufficient cash. As of that date, at least four trade creditors completely cut off Micro Warehouse's credit line.

At the Secured Lenders' repeated urgings, on or about August 5, 2003, the D & O Defendants finally approved the retention of Alix Partners as restructuring advisor to the Company. An August 8, 2003 draft presentation prepared by the Company discussed the Company's "strategic options" and concluded that its "best option for moving forward" was "to execute upon a 'sell' strategy." Still, the D & O Defendants failed to commence a competitive bidding process at that time. Instead, Defendant Wilson called only upon his "long time acquaintance" John Edwardson ("Edwardson"), the CEO of CDW, and requested that Edwardson talk to Defendant York "seriously and quickly about [Micro Warehouse]." Edwardson agreed and a few days later, on August 11, 2003, Defendants Wilson and York met with Edwardson in Los Angeles to explore the possibility of transaction with CDW. As of that date, the D & O Defendants had not contacted any company other than CDW to seriously discuss a possible transaction.

**The D & O Defendants Abdicate Crucial Authority to Defendant Ramaekers**

Although the financial condition of the Company continued to worsen on a daily basis, the D & O Directors let nearly two weeks pass from the date they approved the concept of retaining Alix Partners to the date they actually did so. On or about August 18, 2003, the D & O Directors retained Alix Partners, through its affiliate AP Services, LLC, to furnish the Company with restructuring professionals. Among these professionals was Ramaekers. On or about August 19, 2003, Ramaekers was appointed by the Company's board of directors to the position of Chief Operating Officer.

On or about August 19, 2003, Ramaekers commenced work at Micro Warehouse. At or about this time, the D & O Defendants *abdicated* crucial decision-making authority to Ramaekers.[4] From this point until their resignations, in breach of their fiduciary duties, the D & O Defendants failed to supervise Ramaekers adequately. By Friday, August 22, 2003, within 72 hours of commencing work at Micro Warehouse, Ramaekers had determined to sell the Assets.

**Defendant Ramaekers Conducts a Flawed Sales Process**

Instead of commencing a competitive bidding process for the Assets, however, Ramaekers immediately seized upon the CDW opportunity identified a few days before. On or about the same day that Ramaekers arrived at Micro Warehouse, CDW sent a written list of requests for documents to begin its due diligence. Micro Warehouse then began the process of assembling a data room at its headquarters in Norwalk, Connecticut.

Ramaekers did not hire investment bankers to "shop" the deal; he did not conduct a thorough search for potential strategic buyers; and he did not even consider contacting potential financial buyers. Instead, Ramaekers seized on the fact that York and Wilson had already had a meeting with CDW, and he quickly settled on CDW as the favored acquirer. On or

---

**4.** Throughout this statement of facts, taken from the Complaint, the emphasis has been added by the Court.

about August 27, 2007, five days after Ramaekers recommended an asset sale, CDW arrived in Connecticut to begin its on-site due diligence. At the close of the following day, CDW made its first offer. Over the course of the Labor Day weekend, August 30–September 1, 2003, CDW and Micro Warehouse negotiated only small changes in the terms of the offer, resulting in a "handshake deal" on September 2, 2003 with business terms only somewhat improved over CDW's initial offer. In the week and a half between Ramaekers recommending a sale of the Assets and the "handshake deal" between Micro Warehouse and CDW, *neither* Ramaekers nor the D & O Defendants made a *serious effort* to contact other potential purchasers.

Ramaekers made contact with one other potential acquirer, PC Connection, but provided PC Connection with only limited due diligence materials. PC Connection's CEO, Patricia Gallup ("Gallup"), testified that her company was provided access to the due diligence materials over the Labor Day weekend, and was not given adequate time to perform its due diligence. PC Connection's efforts to obtain due diligence on the Company were further stymied on September 2, 2003—the day after Labor Day—when Micro Warehouse entered into an agreement with CDW to *negotiate exclusively* with CDW until September 9, 2003. When PC Connection contacted Micro Warehouse on September 3, 2003, and sought to obtain due diligence, PC Connection was told that Micro Warehouse could not provide the requested information due to the exclusivity provision. Gallup testified that Micro Warehouse never permitted PC Connection to submit its best and final offer.

As for other bidders, Micro Warehouse, through Ramaekers, *made only cursory calls* to Dell and Apple to see if either was interested in a transaction. The D & O Defendants and Ramaekers failed to seriously consider Dell as a potential purchaser, notwithstanding Micro Warehouse's previous observation that it should "pitch[ ]" Micro Warehouse's strengths "to buyers who meet the selection criteria (e.g. Dell)."

Other competitors of Micro Warehouse were not contacted at all to see if they were interested in bidding on the Assets. The most significant of these was Office Depot, a large, publicly-traded company that was interested in acquisitions in the industry. That the D & O Defendants, through Ramaekers, *failed to conduct an adequate sales process* is illustrated by a letter that counsel for Office Depot wrote on September 15, 2003, when the deal with CDW had already closed. Office Depot complained that it was not informed of any opportunity to bid on the Company's domestic and Canadian assets, and that it would have had a serious interest in such a transaction, and had the resources to pursue a transaction within the timeframe apparently dictated by the exigencies. The failure of Ramaekers and the D & O Defendants to contact Office Depot is even more incredible considering Office Depot had previously expressed an interest in potential acquisitions.

Illustrating another lost opportunity, Tim Crown ("Crown"), CEO of Insight Enterprises—a Micro Warehouse competitor—testified that he was never informed that the United States business was for sale. Crown gave testimony that in late August 2003 he received a voicemail from Defendant Rullman, but before Crown even had a chance to return Rullman's phone call, Crown learned that Micro Warehouse had reached an agreement to sell the Company's United States and Canadian assets to CDW. Crown testified that he didn't realize until it was too late

that "Micro Warehouse was going to the auction block, so to speak."

Ramaekers also failed to inform PC Mall—another Micro Warehouse competitor that had previously shown a strong interest in a transaction with Micro Warehouse—that Micro Warehouse's United States business was for sale. Frank Khulusi, CEO of PC Mall, testified that his "agenda was to buy Micro Warehouse's domestic business," however, the first he heard that Micro Warehouse was interested in selling its United States business was when the Company issued a press release announcing that a deal had been reached with CDW.

Ramaekers and the D & O Defendants also *did not make any effort* to contact potential *financial buyers*.

### Defendants' Failures to Act in the Company's Best Interests Culminate in the Rushed Sale to CDW on the Eve of Bankruptcy

The D & O Defendants' failures to either sell or restructure the Company earlier, and their *abdication* of responsibility to Ramaekers, finally culminated in the *uninformed and hurried sale* of a substantial portion of the Company's North American assets to CDW for a grossly low price on September 9, 2003. In breach of their fiduciary duties of loyalty, care and good faith, the D & O Defendants acted on an *uninformed* basis, and failed to act in good faith, by approving the "fire sale" of the Assets to CDW on September 4, 2003.

The Company announced on September 8, 2003 that an agreement had been reached to sell the Assets to CDW. Pursuant to the Asset Purchase Agreement (the "APA"), CDW paid the Company $28,000,000 for the Assets. The transaction closed on September 9, 2003. The outcome of the "fire sale" conducted by Ramaekers, and approved by the D & O Defendants, was that the Company's Unit-

ed States core business, which produced approximately $900,000,000 of revenue annually, was conveyed to CDW for $28,000,000, a small fraction of its value, to the detriment of the Company, its shareholders and its creditors. On September 10, 2003, the Debtors then filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### Defendants' Acts and Omissions Constitute Breaches of Their Fiduciary Duties

The D & O Defendants *acquiesced* in Ramaekers' decision to sell the Assets in a hurried manner outside the supervision of the Bankruptcy Court. They allowed Ramaekers to market the Assets in a *rushed and ineffective manner*, and to negotiate terms of a sale, and then to consummate the sale of the Assets, in a highly compressed period surrounding the Labor Day holiday weekend. This expedited *sale process was massively deficient* and resulted in the Company's receiving grossly inadequate consideration for the Assets, to the detriment of the Company, its shareholders and its creditors.

### The Culmination of Defendants' Acts and Omissions in the CDW Transaction Damaged the Company, its Shareholders and its Creditors

The conclusion that the *flawed sale process* and the CDW sale transaction were not in the best interests of the Company, its shareholders, or its creditors is supported by testimony from industry participants, who testified that the $28,000,000 sale price grossly undervalued the Assets. CDW performed its own discounted cash flow valuation of the Assets and business it planned to acquire from Micro Warehouse. In this analysis, CDW's Vice President for Business Development, concluded that the present value of Micro Warehouse's United States operations was $126,000,000— more than four times the purchase price.

The investing public and contemporaneous reports issued by professional financial analysts further support the conclusion that the CDW sale transaction was not in the best interest of the Company, its shareholders and its creditors. *No disclosure was made by the D & O Defendants* that Micro Warehouse was facing a liquidity and financial crisis, that Micro Warehouse had hired a crisis manager, and that *decision-making authority* had been *transferred* to Ramaekers.

**Summary**

The Trust seeks to recover damages for the D & O Defendants' breaches of the fiduciary duties of loyalty, care and good faith that occurred as a result of (a) the D & O Defendants failing to put the Assets up for sale earlier, before a liquidity crisis ensued; (b) the D & O Defendants' failing to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; (c) the D & O Defendants' *abdicating* all responsibility to Ramaekers, and then *failing to supervise him;* and (d) the D & O Defendants' *acquiescing* in Ramaekers' decision to sell the Assets quickly, immediately before filing a chapter 11 petition, rather than in a court-supervised auction under § 363 of the Bankruptcy Code. All of these acts and omissions culminated in the hasty consummation of an asset sale to CDW for grossly inadequate consideration. The approval and closing of this transaction constituted further breaches of the duty of loyalty and the duty of care by D & O Defendants, resulting in the Company, its shareholders and its creditors suffering damages. Furthermore, the D & O Defendants *acquiesced* in Ramaekers' decision to sell the Transferred Assets in a *rushed and uninformed manner* that resulted in the Company's receiving grossly inadequate consideration for the Assets.

As to Ramaekers, he breached his fiduciary duties of care and loyalty to the Company, its shareholders, and its creditors when he acted with *gross negligence* and *in bad faith* by: (a) conducting a *massively deficient sale process*, failing to consider all material information that was reasonably available to him, and (b) selling the Assets in a rushed and *uninformed* manner, resulting in the Company's receiving grossly inadequate consideration for the Assets.

Except as to Ramaekers, the Complaint does not describe the level of the Defendants' financial or business knowledge or experience. As to Ramaekers, the Complaint does refer to "his unique experience with financially distressed companies." In their reply, the D & O Defendants identify Ramaekers as a "respected expert". Of course, this is a factual assertion with no support in the record. Consequently, I give it no consideration. In support of his motion to dismiss, Ramaekers asserts that "[t]his Court should take judicial notice that Micro Warehouse's board was composed of experienced and sophisticated directors." (Doc. # 42, p. 3) This factual assertion likewise has no support in the record and will be given no consideration.

**STANDARD OF REVIEW**

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure, which is made applicable to this case by Rule 7012 of the Federal Rules of Bankruptcy Procedure. The Supreme Court held just last year that its previous formulation of the notice-pleading standard in *Conley v. Gibson* "had earned its retirement," and heightened the requirements to be satisfied by a plaintiff to state a valid claim. *Bell Atlantic v. Twombly*, 550 U.S. ——, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss

under Fed.R.Civ.P. 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964–65. Rather, a complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: "the threshold requirement of Rule 8(a)(2) [is] that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.' " *Id.* at 1965–66. "It remains an acceptable statement of the standard ... that courts 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' " *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)(citing *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 374 n. 7).[5]

## DISCUSSION

### Statute of Limitations

The D & O Defendants assert that portions of the causes of action set forth in the Complaint are barred by the statute of limitations. The D & O Defendants argue that the fiduciary duty counts are based upon what they label as four "Challenged Actions": (1) failing to put the Assets up for sale earlier; (2) failing to hire a restructuring advisor earlier in 2003; (3) abdicating responsibility to Ramaekers and failing to supervise the restructuring professional; and (4) acquiescing in Ramaekers' decision to sell the Assets in an allegedly rushed and uninformed manner. According to the D & O Defendants, the first two Challenged Actions are based on events before the D & O Defendants took

steps to engage Alix Partners as the restructuring expert, and the last two are based on events after Ramaekers became Chief Operating Officer of Micro Warehouse.

The Delaware statute of limitations for the claims here is three years. 10 *Del. C.* § 8106. On August 17, 2006 the Trust and the Defendants entered into a Tolling Agreement effective as of August 17, 2006 (the "Tolling Date"). The Tolling Agreement states that "[a]ny Claim which was barred by the statute of limitations or any other time based defense prior to the Tolling Date shall not be revived by this Tolling Agreement." Thus, according to the D & O Defendants, since the first two Challenged Actions occurred before the Tolling Date, they are now barred by the three year statute of limitations.

In its opposition, the Trust argues that "D & O Defendants improperly try to redefine the nature of their 'wrongful act' by splitting the Trust's claims into four separate 'Challenged Actions' " (Doc. # 31, p. 20.) I do not agree. I believe that the D & O Defendants appropriately characterize the Challenged Actions as four separate alleged wrongs. In Counts I through IV, the Trust asserts breach of fiduciary duty and a lack of good faith under Delaware law. In each of those Counts, the Complaint identifies the particular D & O Defendants who are accused by the Counts and summarizes the conduct constituting their breach of fiduciary duty, or duty of loyalty, or duty of due care by asserting that "Defendants (a) failed to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) failed to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the

---

**5.** In analyzing the *Twombly* decision, the Third Circuit in *Phillips* found that the new standard adopted in *Twombly* was not limited to anti-trust claims as in *Twombly,* but was "intended to apply to the Rule 12(b)(6) standard in general." *Id.* at 232.

Secured Lenders; and (c) abdicated crucial decision-making authority to Alix Partners designee Lawrence Ramaekers, and (d) then failed to adequately supervise him, which culminated in the Company receiving grossly inadequate consideration for the Transferred Assets." (Complaint, Count I ¶ 106.) (Complaint Counts II—¶ 113, III—¶ 120 and, IV—¶ 129 read essentially the same as Count I ¶ 106.)

The Trust makes two arguments in opposition to the D & O Defendants' statute of limitations position. First, the Trust argues that the statute of limitations for breach of fiduciary duty claim does not begin to run until the "latest date that an alleged wrongful act may have occurred." *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 184 (D.Del.2000); (Doc. # 31, pp. 19–20); *see also Albert v. Alex. Brown Mgmt. Servs.*, No. 762, 2005 WL 1594085, at *16 (Del.Ch. June 29, 2005)(denying motion to dismiss on statute of limitations grounds where claim was not for "a discrete wrong, which occurred at a specific time," but rather for breach of a "continuing duty to actively manage and supervise"); *Miller v. McCown De Leeuw & Co., Inc., (In re The Brown Schools)*, 368 B.R. 394, 402 (Bankr.D.Del.2007) (rejecting the argument that breach of fiduciary duty claims were time-barred simply because certain activities may have occurred more than three years before the limitations period ran). According to the Trust, the D & O Defendants' ultimate "wrongful act" was approving the sale to CDW for grossly inadequate consideration. Thus, according to the Trust, the limitations period began to run, at the earliest, on September 4, 2003, the date the Micro Warehouse board approved the CDW Transaction. (Doc. # 31, p. 20.)

 Second, the Trust argues that under Delaware's "discovery rule," the statute of limitations is tolled "where the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.'" *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319; *see also Cantor v. Perelman*, 414 F.3d 430, 440 (3d Cir.2005) (applying Delaware law, tolling statute for breach of fiduciary duty claim until "a reasonably diligent and attentive stockholder knew or had reason to know the facts alleged to constitute the breach of fiduciary duty"); *In re Verisign, Inc., Deriv. Litig.*, 531 F.Supp.2d 1173, 1215 (N.D.Cal.2007)(applying Delaware law, holding that the statute for a breach of fiduciary duty claim did not begin to run until plaintiffs were put on "inquiry notice"). In such a case, "the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." *Wal–Mart*, 860 A.2d at 319 (internal quotations omitted). The statute of limitations also will be tolled if the defendants fraudulently conceal acts and/or omissions that give rise to the claim. *See, e.g., EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir.2002)(applying Delaware law); *In re Fruehauf*, 250 B.R. at 186.

As discussed below, I find the D & O Defendants counter position as set forth in their reply brief to be much more persuasive than the Trust's position.

 The Trust acknowledges that a claim for breach of fiduciary duty accrues at the time of the wrongful act. (Doc. # 31, p. 19) (citing *Wal–Mart*, 860 A.2d at 319). This is true, "even if the plaintiff is ignorant of the cause of action." *Wal–Mart*, 860 A.2d at 319; *EBS Litig. LLC*, 304 F.3d at 305. However, the Trust ignores its own allegations in the Complaint

that the D & O Defendants breached their fiduciary duties by engaging in the four separate Challenged Actions. Instead, the Trust attempts to combine all four Challenged Actions into the fourth and "ultimate 'wrongful act'"—"approving the sale to CDW." The Trust cites no case law that supports this position. In citing *Fruehauf Trailer Corp.*, the Trust misconstrues the description of the parties' agreement in that case regarding the "latest date that an alleged wrongful act may have occurred" as a rule. *Fruehauf*, 250 B.R. at 184. The court actually found that the plaintiffs' claims appeared to be barred because "they were filed well more than three years after the latest possible date that the action accrued." *Id.* (denying motion to dismiss because the statute was tolled). The latest date either of the first two Challenged Actions could have occurred was the beginning of August 2003.

Similarly, the Trust misconstrues *The Brown Schools*, which it cites as "rejecting [the] argument that breach of fiduciary duty claims were time-barred simply because certain activities may have occurred more than three years before the limitations period ran." (Doc. # 31, p. 20.) The court did not actually address this argument; it merely finds that the "events that allegedly triggered a breach of fiduciary duty began" within the statute of limitations. *The Brown Schools*, 368 B.R. at 402.

Finally, the Trust relies on *Albert v. Alex. Brown Management Services, Inc.*, which granted a motion to dismiss on six of the seven factual bases. The one factual basis that survived was the allegation that the defendant Fund managers' failed to manage the Funds. This was "not a discrete wrong, which occurred at a specific time. Instead, [the defendants] owed (and owe) a continuing duty to actively manage and supervise the Funds." *Alex. Brown Mgmt. Servs.*, 2005 WL 1594085, at *16.

Accordingly, the court could not say that "this wrongful act occurred" outside the statute of limitations. *Id.*

In contrast, it is precisely the timing of the first two Challenged Actions which forms the basis of the Trust's contention that they are actionable; the Trust complains that the D & O Defendants did not start selling the Assets or hiring a restructuring expert earlier than they did, at the beginning of August 2003. Accordingly, the first two Challenged Actions by definition took place before the beginning of August 2003, which is outside the limitations period.

■ Where a plaintiff brings a claim based upon multiple allegedly wrongful acts, a court considers each act in turn in applying the statute of limitations. *See id.* at *13 (where "complaints alleges seven different types of wrongdoing by the defendants," the court "addresses each of the factual bases, and the accrual, of these claims in turn," holding six of the seven acts were time-barred). The Trust's attempt to incorporate claims arising out of the earlier allegedly wrongful acts into the last act is futile because a cause of action accrues when the wrongful act takes place. *Wal–Mart*, 860 A.2d at 319. Any claim arising out of the first two Challenged Actions accrued when they took place, before August 17, 2003.

The Trust's second argument is that the statute of limitations on the first two Challenged Actions was tolled by one of the following theories: the discovery rule, fraudulent concealment, or equitable tolling. (Doc. # 31, p. 21.) To survive the motion to dismiss on the basis of "a tolling exception," the Trust "must [have] plead[ed] facts supporting the applicability of that exception." *Forsythe v. ESC Fund Mgmt. Co.*, No. 1091, 2007 WL 2982247, *14, (Ch. Del. Oct. 9, 2007); *In re Dean Witter P'ship Litig.*, No. 14816, 1998 WL

442456, *6, 1998 Del. Ch. LEXIS 133, *23, (Del. Ch. July 17, 1998)("plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled."). The Trust has not carried his burden on this point.

▆▆▆▆ The statute is tolled under the discovery rule if "the discovery of the existence of [the] cause of action is a practical impossibility." *Dean Witter*, 1998 WL 442456, at *5, 1998 Del. Ch. LEXIS 133, at *19. "[T]here must have been no observable or objective factors to put a party on notice of an injury ...." *Id.* at *5, 1998 Del. Ch. LEXIS 133, at *20. The Trust does not allege that there were no observable factors which would have put Micro Warehouse on notice. In fact, as discussed below, Micro Warehouse was necessarily on notice of the D & O Defendants' actions.

▆▆▆▆ Under the doctrine of fraudulent concealment, the plaintiff must prove,

an affirmative act of concealment by the defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put the plaintiff off the trail of inquiry.

*Fruehauf*, 250 B.R. at 186. This tolling exception does not apply if the defendant allegedly conceals facts from a third party. Here, the Trust asserts causes of action that are those of Micro Warehouse; it does not assert creditors' claims. The only acts of concealment or misrepresentations alleged in the Complaint, however, are against Micro Warehouse's creditors. (Complaint, ¶ 91.) These allegations cannot toll the statute of limitations on the causes of action asserted in the Complaint, i.e., claims asserted by the successor to the bankrupt estate.

▆▆▆▆ "Under the theory of equitable tolling, the statute of limitations is tolled

for claims of wrongful self-dealing ... where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Dean Witter*, 1998 WL 442456, at *6, 1998 Del. Ch. LEXIS 133, at *21. While the Complaint alleges the D & O Defendants were fiduciaries, there are no allegations of self-dealing, making this tolling exception inapplicable.

Thus, I find that any claim based on the first two Challenged Actions accrued before August 17, 2003, and no tolling applies to those claims. Accordingly, to the extent the Complaint seeks to assert these two Challenged Actions as distinct and separate bases for recovery against the D & O Defendants, those claims are time barred. However, this is not to suggest that these two Challenged Actions are irrelevant. While the alleged pre-August 17, 2003 conduct may not be the bases for separate actionable recoveries by the Trust, that conduct may serve as a background in accessing the two Challenged Actions that occurred post August 17, 2003.

### Count I—Breach of the Duty of Loyalty

▆▆▆▆ The D & O Defendants argue that Count fails because it does not allege that the D & O Defendants acted out of any self-interest or that they lacked independence regarding the Assets sale. The D & O Defendants cite *Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 385 F.Supp.2d 449, 460 (D.Del.2004), as identifying the requirements for such a claim.

To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must "plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence." To show that a director was interested, it is usually necessary to show that the director was on both sides

of a transaction or received a benefit not received by the shareholders.

*Id.* (italics in original; citations omitted). "[A] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders". *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993).

According to the D & O Defendants, there is absolutely no suggestion that the D & O Defendants acted in any way out of any self-interest or that they lacked independence regarding the Assets sale. Nor does the Complaint allege that the D & O Defendants received any unjust benefit— or any personal benefit at all—from the Assets sale. Accordingly, the D & O Defendants say that the breach of the duty of loyalty count should be dismissed.

■ In its opposition, the Trust argues that the D & O Defendants are wrong in asserting that a duty of loyalty claim can only be sustained where the directors and officers acted out of self-interest or where they lacked independence regarding the Assets sale. I agree. The Delaware Supreme Court recently clarified that a claim for breach of loyalty may be premised upon the failure of a fiduciary to act in good faith. *Stone v. Ritter,* 911 A.2d 362, 370 (Del.2006)

> [T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith.

> \* \* \*

> Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*See also, Morris v. Zelch (In re Reg'l Diagnostics LLC),* 372 B.R. 3, 30 (Bankr. N.D.Ohio 2007)(holding that "under Delaware law a claim for breach of the duty of loyalty can be premised on a failure to act in good faith"); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I),* 353 B.R. 324, 344 (Bankr.D.D.C.2006)("[M]aking a decision that is not in the corporation's best interests-*abdicating* one's directorial duties—is a breach of the fiduciary duty to act in good faith, . . . which is just another permutation of the fiduciary's duty of loyalty.")(emphasis added)(citing *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 65– 68 (Del.2006)); *Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del.Ch.2003)("A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.").

■ The Trust has alleged sufficient facts to support the claim that the D & O Defendants breached their duty of loyalty and acted in bad faith by consciously disregarding, i.e., abdicating, their duties to the Company. Fiduciaries breach their duty of loyalty by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties. *Stone,* 911 A.2d at 369; *see also Desimone v. Barrows,* 924 A.2d 908, 933 (Del.Ch.2007)(fiduciaries can be held liable if they are "disloyal" to the corporation, including if they fail to obtain information as result of their "knowing *abdication* of their directorial duties") (emphasis added). In other words, "acts taken in bad faith breach the duty of loyalty." *See Ryan v. Gifford,* 918 A.2d 341, 357 (Del.Ch.2007) (citing *Stone* for this proposition). A fiduciary acts in bad faith when, among other things, he takes or fails to take any action that demonstrates a "faithlessness or lack of true devotion to the interests of the corporation and its shareholders." *Id.*

Here, taking the facts alleged as true and viewing all inferences in the light most favorable to the Trust, the allegations support the claim that the D & O Defendants breached their fiduciary duty of loyalty and failed to act in good faith by *abdicating* crucial decision-making authority to Ramaekers, and then failing adequately to monitor his execution of a "sell strategy," resulting in an abbreviated and uninformed sale process; and approving the sale to CDW for grossly inadequate consideration.

In *Boles v. Filipowski (In re Enivid, Inc.)*, a case involving similar claims to those alleged here, the trustee brought a breach of fiduciary duty action against former directors and officers of an internet holding company that filed for bankruptcy after the dot-com bubble burst. 345 B.R. 426 (Bankr.D.Mass.2006). The trustee alleged, among other things, that the directors and officers "consciously and intentionally disregarded their responsibilities by knowingly failing to make decisions critical to [the company] on an informed basis." *Id.* at 452. The bankruptcy court, applying Delaware law, denied in part a motion to dismiss, holding that the claims could survive by alleging that "the [d]efendants breached their duty of good faith to [the company] and its creditors by approaching the operation of [the company] with a level of indifference or egregiousness that amounted to bad faith." *Id.*

And in *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins,* the Court of Chancery denied in part a motion to dismiss where the plaintiff alleged that the board "consciously and intentionally disregarded its responsibilities." No. 20228, 2004 WL 1949290, *12 (Del.Ch. Aug.24, 2004). There, the plaintiff alleged that the board approved a group of loans without any deliberation, consultation with an expert, or decision process. *Id.* The court found that those allegations "would imply knowing and deliberate indifference to the Board's duties to act faithfully and with appropriate care." *Id.* Thus, the court refused to dismiss that portion of the complaint. *Id.*

To put the above described holdings into the context here, I briefly summarize what the Complaint says happened in the CDW sale transaction.

On August 19, 2003, Ramaekers came on board as the Chief Operating Officer. By August 22, 2003, within 72 hours of commencement of his work at Micro Warehouse, Ramaekers had determined to sell the Assets. No competitive bidding process took place and no investment banker was hired to "shop" the deal. Only cursory contacts were made to search for strategic buyers and no consideration was given to contacting potential financial buyers.

On August 27, 2003, CDW began its onsite due diligence. At the close of the next day, CDW made its first offer. Over the Labor Day weekend, August 30–September 1, CDW and Micro Warehouse negotiated only small changes to the terms of the first offer resulting in a "hand shake" deal on September 2, 2003. Micro Warehouse agreed to deal exclusively with CDW and the contract of sale was signed on September 8, 2003. The Assets were sold to CDW for $28,000,000. The closing took place on September 9, 2003 and the petition was filed on September 10, 2003.

In connection with a September 4, 2003 CDW board meeting to consider the purchase, CDW's vice president for business development concluded, on the basis of a discounted cash flow analysis performed by CDW, that the present value of the Assets was $126,000,000. At least three competitors complained that they did not get sufficient notice of the fact that the Assets were for sale and they would have been serious potential buyers had they

been given the opportunity. Following the public announcement of the transaction, a number of financial market analysts expressed the view (with appropriate analysis to back it up) that the $28,000,000 purchase price was a small fraction of the value that CDW obtained. Of course, the Trust filed a fraudulent conveyance action against CDW and CDW settled that action by paying the Trust $25,000,000—an amount almost equal to what the D & O Defendants bargained for in selling the Assets to CDW.

I believe it is fair to say that the sale to CDW was a failed transaction from Micro Warehouse's view. Was it the result of a combination of events beyond the control of the D & O Defendants or is it explained (as alleged in the Complaint) by the D & O Defendants *abdication* of their fiduciary duties? At this stage of this proceeding, there is no record to support the former and the reasonable inferences drawn from the allegations in the Complaint favor the latter.

The Motion will be denied as to Count I.

**Count I and Count II as to Midler**

With respect to Count I and Count II, the D & O Defendants also argue that since Midler was not a director during the relevant period he should not be included in those Counts as a director. Specifically, the Complaint alleges that Midler was only a director for a few days, beginning on September 6, 2003, and that the Challenged Actions all took place on or before September 4, 2003, the date on which the Micro Warehouse board of directors approved the agreement to sell the Assets to CDW. The alleged abdication of responsibility to Ramaekers and acquiescence in his Assets sale process preceded the approval of the sale on September 4, 2003.

In response, the Trust argues that the Complaint plainly states that Midler

served as a director of Bridgeport Holdings, Inc. from on or about September 6, 2003—which was before the transaction was consummated on September 8 and 9, 2003. The Complaint specifically alleges that Midler and Ramaekers oversaw the consummation of the Assets sale for less than reasonably equivalent value to CDW. However, the Complaint does not allege that Midler undertook that oversight effort as a director.

This Count is thin to say the least and the Trust does not provide any legal authority to support the notion that an individual becomes liable for breaching the duty of loyalty to a company if he is appointed its director after that company has contracted to sell assets, and the new director allows the company to fulfill—or even oversees its fulfillment of—its contractual obligations.

To the contrary, Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful. *Gantler v. Stephens,* No. 2392, 2008 WL 401124, * 13 (Del.Ch. Feb.14, 2008) (citations omitted).

Since Midler is only alleged to have become a director after the Assets sale was approved—when all that was left to be done was the "consummation" of the approved sale—Midler cannot fairly be held responsible as a director for a breach of the duty on the two remaining Challenged Actions. Thus, Count I and Count II will be dismissed as to Midler in his capacity as a director.

**Count II—Breaches of Duty of Care—Exculpation Provision—Business Judgment Rule**

To defeat this Count the D & O Defendants rely on Micro Warehouse's certifi-

cate of incorporation exculpatory provision:

> A director of the Corporation shall have no personal liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for any act or omission not in good faith or which involves intentional misconduct or a knowing violation of law, (iii) for the unlawful payment of dividends or unlawful stock repurchases under Section 174 of the General Corporation Law of the State of Delaware, as the same exists or hereafter may be amended or (iv) for any transaction from which the director derived an improper personal benefit.

This provision tracks the language of 10 Del. C. § 102(b)(7), empowering Delaware corporations to limit the liability of their directors.

■■■ "A defense under § 102(b)(7) may be considered in the context of a motion to dismiss." *Elkins*, 2004 WL 1949290, at *35 n. 38.

The D & O Defendants rely significantly on *IT Litig. Trust v. D'Aniello (In re IT Group Inc.)* where our District Court dismissed the duty of care claim, finding that "[t]he duty of care claims must be dismissed ... because the IT Group's Certificate of Incorporation contains an exculpatory provision." No. 04–1268, 2005 WL 3050611, *10, 2005 U.S. Dist. LEXIS 27869, *39, (D.Del. Nov. 15, 2005), (citation omitted).

> Once the § 102(b)(7) provision is raised against duty of care claims, that is "the end of the case."
>
> ... [T]he directors are protected by § 102(b)(7) against liability for breaching the duty of care. Counts I and II against the directors, to the extent that

those counts allege breaches of the duty of care, must therefore be dismissed. *Id.* at *11, 2005 U.S. Dist. LEXIS 27869, *40–41 (citation omitted).

■■■ The D & O Defendants also reply on the business judgment rule.

> Directors ... are protected by the business judgment rule. Plaintiff must allege sufficient facts to support a reasonable inference that the Directors breached their fiduciary duties, and thereby overcome that presumption and change the standard of review from business judgment to entire fairness.

*Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577, 2007 WL 4292024, *4, 2007 Del. Ch. LEXIS 169, *12–13 (Del.Ch. Nov. 30, 2007). According to the D & O Defendants, no such allegations are contained in the Complaint.

■■■ Further, "it is ... firmly established under Delaware law that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets." 1 R.F. Balotti & J.A. Finkelstein, *The Delaware Law of Corporations and Business Organizations*, § 10.6[A], (3d Ed.2007).

According to the D & O Defendants, the "facts" contained in the Complaint present a perfectly legitimate business purpose for the alleged conduct of the D & O Defendants. The Complaint paints a picture of a company whose financial condition had been pummeled by a recession while it bore a hefty debt load. Rather than liquidating the Company immediately, the D & O Defendants took a number of steps to improve Micro Warehouse's financial condition, including evaluating M & A Alternatives, amending its loan covenants and renegotiating its Credit Agreement. Despite these efforts, by August 2003, Micro Warehouse had lost most of its trade cred-

it lines, disabling it from obtaining supplies in a timely fashion, and its sales force was dissipating. The D & O Defendants evaluated the available options, and made the judgment that the likely best alternative was to sell the Assets. Simultaneously, the D & O Defendants determined they would, and then did, hire an restructuring professional to advise them in this regard, and that professional advised the Company to sell the Assets immediately. According to the D & O Defendants, these actions present legitimate business decisions.

D & O Defendants also point out that the Complaint does not allege that the D & O Defendants were self-interested or conflicted in any way. Addressing a breach of fiduciary duty claim under similar circumstances in *Tower Air*, the Third Circuit affirmed the claim's dismissal, holding,

> [e]ven under notice pleading standards, Stanziale's claim that Tower Air's directors breached their duty to act in good faith by declining to repair Tower Air's jet engines and instead replacing them with new engines must fail. We consider that an allegation of a classic exercise of business judgment because a reasonable business person could have reached that decision in good faith. Certainly, bad faith is not the only possible explanation for the decision.

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 239 (3d Cir.2005) (citations omitted). According to the D & O Defendants, the "facts" alleged in the Complaint similarly present a "classic exercise of business judgment."

In opposition, the Trust argues as follows.

"When a duty of care breach is not the *exclusive* claim, a court may not dismiss [the duty of care claim] based upon an exculpatory provision." *Alidina v. Internet.com Corp.*, No. 17235, 2002 WL 31584292, at *8 (Del.Ch. Nov.6, 2002)(emphasis in original). In this case, the Trust has alleged facts supporting a breach of the duty of loyalty as well as a lack of good faith, in addition to a breach of the duty care. Since these questions of the D & O Defendants' loyalty or lack of good faith trigger entire fairness review, an exculpatory provision simply cannot justify a dismissal of the duty of care claims.

In *Alidina*, the Chancery Court analyzed a claim that directors breached their fiduciary duties of care and loyalty in approving and recommending a merger. There, the directors—like the D & O Defendants here—argued that even if a duty of care claim were established, it should be dismissed because the company's charter contained a § 102(b)(7) provision. *Id.* at *6. The court disagreed:

> At this stage, I cannot dismiss plaintiffs' duty of care claim based upon an exculpatory provision contained in the [company's] charter. As *Malpiede*, and *Emerald Partners [v. Berlin*, 787 A.2d 85 (Del.2001)] instruct, when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision. Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

*Id.* at *8 (emphasis in original).

The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) "use that amount of care which ordinarily careful and prudent men would use in similar circumstances"; and (2) "consider all material information reasonably available." *Disney*, 907 A.2d at 749. The Delaware Supreme Court has squarely described two contexts in which liability for a breach of the duty of care can arise:

First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss.

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del.Ch.1996)(emphasis in original).

 The first class of cases are subject to review under the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). Yet to invoke the rule's protections in the context of a duty of care, "directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993). Thus, if the "directors individually and the board collectively" fail to inform themselves "fully and in a deliberate manner," then they "lose the protection of the business judgment rule" and the court is "required to scrutinize the challenged transaction under an entire fairness standard of review." *Id.* at 368. In this regard, the Delaware Supreme Court has held that gross negligence is the proper standard for determining whether a business judgment reached by a board of directors was an informed one. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985). As for the second class of cases, where a loss results from director inaction, the protections of the business judgment rule do not apply. *Disney*, 907 A.2d at 748. Under those circumstances, a "sustained or systematic failure" of a director to exercise reasonable oversight constitutes a breach of the director's duty of care. *Id.* at 750 (citing *Caremark*, 698 A.2d at 971).

An instructive case is *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 208 B.R. 288 (Bankr.D.Mass.1997) (applying Delaware law). In that case, the board approved a leveraged buyout that left the corporation with unreasonably small capital. In so doing, the directors failed to review cash projections indicating that the debtor would be left with insufficient capital after the LBO. *Id.* at 306–07. The directors also failed to ask their financial advisor to analyze the due diligence prepared by the purchaser. *Id.* The bankruptcy court found that the directors did not fulfill their "duty to inform themselves, prior to making [that] business decision, of all material information reasonably available to them" and, thereby, breached their fiduciary duty of care. *Id.* at 306.

Here, as in *Hicks*, the D & O Defendants allegedly approved an uninformed fire-sale of the Company's most valuable assets on the eve of bankruptcy. Like the directors in *Hicks*, the D & O Defendants also allegedly failed to inform themselves, prior to approving the sale to CDW, of all material information reasonably available to them. The D & O Defendants never hired an investment banker to shop the deal or value the Assets. They never sought a fairness opinion, and they failed to seek offers from other likely purchasers. Thus, like the directors in *Hicks*, the D & O Defendants allegedly failed to inform themselves of all material information reasonably available to them and, thereby, breached their duty of care.

It is puzzling as to how the D & O Defendants could have decided to proceed with the CDW sale without knowing what price other prospective purchasers, such as Office Depot, would have been willing to pay. Ordinarily careful and prudent directors would have worked to ensure that any sale process was entirely competitive in an effort to collect the highest price for

the company's assets. Instead, as alleged, the D & O Defendants simply approved the CDW deal that arose out of Wilson's long-time acquaintance with the CEO of CDW. *See Mims v. Kennedy Capital (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 111 (Bankr.N.D.Tex.1999)("[The CEO's] failure to diligently market [the company's] assets constitutes a breach of his duty of care.").

It is not surprising that, in the sale context, a board's failure to obtain a valuation of their company's assets and failure to adequately market those assets constitute breaches of the duty of care. The Delaware Supreme Court has explained that "[t]he statutory duties and common law fiduciary responsibilities that directors of a Delaware corporation are required to discharge depends upon the specific context that gives occasion to the board's exercise of its business judgment." *McMullin v. Beran*, 765 A.2d 910, 918 (Del.2000). And because this case relates to what was effectively a sale of the Company, in a liquidation of all or substantially all of a company's assets,

> the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for all stockholders. In pursuing that objective, the directors must be especially diligent "and they must exercise their fiduciary duties to further that end."

*Id.* (citation omitted). Here, the facts alleged in the Complaint show anything but directors who were "especially diligent." To the contrary, drawing reasonable inferences in the light most favorable to the Trust, it shows directors who decided to conduct a rushed sale without informing themselves, prior to making that decision, of all material information reasonably available to them.

The D & O Defendants reply by arguing that the cases cited by the Trust do not support the position that if any of its claims for breach of loyalty or lack of good faith survive, then the effect of the exculpatory provision on the duty of care claims is nullified. According to the D & O Defendants, *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del.2001), specifically endorsed dismissal of duty of care claims at the motion to dismiss stage when an exculpatory provision exists. The D & O Defendants also rely heavily on *IT Group*.

In its opposition, the Trust suggests that the District Court in *IT Group* misunderstood and, indeed, misconstrued the Delaware Supreme Court's opinion in *Malpiede*. According to the D & O Defendants, it is the Trust that misconstrues the holding in *IT Group*. With all due respect to our District Court, I decline to follow *IT Group* on this point for the following reason.

I start with *Malpiede*. In that case the Delaware Supreme Court affirmed the Chancery Court's dismissal of a complaint. The complaint included a duty of loyalty claim and a due care claim. The Supreme Court agreed with the Chancery Court that the duty of loyalty claim was properly dismissed. The Supreme Court then went on to address the due care claim, making the following observations:

> Plaintiffs here, while not conceding that the Section 102(b)(7) charter provision may be considered on this Rule 12(b)(6) motion nevertheless, in effect, conceded in oral argument in the Court of Chancery and similarly in oral argument in this Court that if a complaint unambiguously and solely asserted only a due care claim, the complaint is dismissible once the corporation's Section 102(b)(7) provision is invoked.

*Malpiede*, 780 A.2d at 1093.

> Plaintiffs contended vigorously, however, that the Section 102(b)(7) charter

provision does not apply to bar their claims in this case because the amended complaint alleges breaches of the duty of loyalty and other claims that are not barred by the charter provision. As a result, plaintiffs maintain, this case cannot be boiled down solely to a due care case. They argue, in effect, that their complaint is sufficiently well-pleaded that—*as a matter of law*—the due care claims are so inextricably intertwined with loyalty and bad faith claims that Section 102(b)(7) is not a bar to recovery of damages against the directors.

We disagree. It is the plaintiffs who have a burden to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." The plaintiffs are entitled to all reasonable inferences flowing from their pleadings, but if those inferences do not support a valid legal claim, the complaint should be dismissed without the need for the defendants to file an answer and without proceeding with discovery. Here we have assumed, without deciding, that the amended complaint on its face states a due care claim. *Because we have determined that the complaint fails properly to invoke loyalty and bad faith claims, we are left with only a due care claim.* Defendants had the obligation to raise the bar of Section 102(b)(7) as a defense, and they did. As plaintiffs conceded in oral argument before this Court, if there is only an unambiguous, residual due care claim and nothing else—*as a matter of law*—then Section 102(b)(7) would bar the claim. Accordingly, the Court of Chancery did not err in dismissing the plaintiffs due care claim in this case.

*Id.* at 1093–94 (underline emphasis added; italics in original).

But we have held that the amended complaint here does not allege a loyalty violation or other violation falling within the exceptions to the Section 102(b)(7) exculpation provision. Likewise, we have held that, even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section 102(b)(7) charter provision that bars such claims. *This is the end of the case.*

*Id.* at 1094–95 (emphasis added).

The Supreme Court concluded with a statement of the rule applicable here:

Our jurisprudence since the adoption of the statute has consistently stood for the proposition that a Section 102(b)(7) charter provision *bars a claim that is found to state only* a due care violation.

*Id.* at 1095 (emphasis added).

In *IT Group,* the District Court dismissed the duty of care claim, observing: "Once the § 102(b)(7) provision is raised against duty of care claims, that is 'the end of the case' ".2005 WL 3050611, at *11 (quoting *Malpiede,* 780 A.2d at 1095). However, unlike the Supreme Court in *Malpiede,* the District Court had already ruled in the forepart of its opinion that the duty of loyalty claim survived the motion. "I conclude that the Complaint adequately states claims for breaches of duty of loyalty by the directors and Carlyle Defendants...." *Id.* at *7. Thus, I believe that *IT Group* did not follow the jurisprudence articulated by the *Malpiede* court. The *Malpiede* Court dismissed the duty of loyalty claim, but in *IT Group* the District Court did not dismiss the duty of loyalty claim. Here I am holding that the duty of loyalty remains, so that the due care claim is not defeated by § 102(b)(7).

I find the following observations made by the Delaware Supreme Court in *McMullin* as apropos to the particular facts before me.

As noted, a board of directors has a duty under 8 *Del. C.* § 251(b) to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. In the absence of a majority shareholder, we have held that directors "may not *abdicate* that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement."

*McMullin,* 765 A.2d at 919 (emphasis added).

Under 8 *Del. C.* § 251, a director is required "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders." A director's duty to exercise an informed business judgment implicates the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."

*Id.* at 921 (citation omitted).

The Amended Complaint alleges that the Chemical Board met only once to consider the Transaction negotiated by ARCO with Lyondell. At that meeting, ARCO's financial advisor, Salomon Smith Barney, made a presentation to the Chemical Board regarding the terms of Lyondell's proposal and the sale process conducted by ARCO. The Chemical Board approved the Transaction with Lyondell at that one meeting on the basis of the disclosures made to them by ARCO's financial advisor.

*Id.* at 921–22.

The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing

themselves before making their decision. The imposition of time constraints on a board's decisionmaking process may compromise the integrity of its deliberative process. History has demonstrated boards "that have failed to exercise due care are frequently boards that have been rushed."

*Id.* at 922.

One can reasonably infer from the factual allegations in McMullin's Amended Complaint that the Chemical Board *compromised its deliberative process* by seeking to accommodate ARCO's immediate need for cash.

*Id.* at 922 (emphasis added).

The specific allegations contained in McMullin's Amended Complaint, if true, suggest that the directors of Chemical breached their duty of care by approving the merger with Lyondell *without adequately informing themselves* about the transaction and without determining whether the merger consideration equaled or exceeded Chemical's appraisal value as a going concern.

*Id.* at 922 (emphasis added).

To put the above statements by the *McMullin* court into the context here, I incorporate by reference my summary statement of the sale transaction at *supra* pp. 565–66.

Thus, I conclude that neither the exculpatory provision nor the business judgment rule vitiates Count II.

### Counts III and IV—Officers Duty of Due Care

▮▮▮ Count III alleges a claim for breach of the duty of due care and lack of good faith against Boyer, Rullman, Wilson, York (the "Count III Defendants") and Count IV alleges the same against Midler.[6]

---

**6.** Midler and the Count III Defendants will be collectively referred to in this section as the "Count III/IV Defendants."

Both Counts are asserted against the Count III/IV Defendants in their capacities as officers of Micro Warehouse. However, as instructed by *Twombly,* I find that these Counts fail to sufficiently allege facts to support the claims.

While alleging that Boyer, Rullman, Wilson, York, and Midler were "officers," except as to York, the Complaint never identifies which offices any of these individuals supposedly held. Nor, for that matter, does the Complaint allege for which of the five debtor entities that the Complaint collectively defines as the "Company", Boyer, Rullman, Wilson, and York supposedly held an office. Also, the Complaint does not allege that the five defendants named in Counts III and IV were officers of the entity that owned the Assets that were sold to CDW. Indeed, the Complaint does not allege which of those five entities owned the Assets.

Different corporate offices obviously hold different responsibilities. For example, the responsibilities of a Vice President of Marketing are not the same as those of a General Counsel. Without stating which office and which responsibilities each defendant allegedly held, it is not possible to discern what a particular defendant did or failed to do in the exercise of due care in his capacity as holder of that office. In particular, it cannot be said that every officer—regardless of office or scope of duties—was required to have undertaken actions to effect a more informed and orderly sale of the Assets.

■ A complaint fails to state a claim against an alleged officer for breach of fiduciary duty when it fails to allege facts demonstrating that (1) he took part in the challenged conduct and (2) failed to demonstrate the due care attendant to his particular office in doing so. In cases with pleading deficiencies similar to those in the Complaint here, our District Court has granted dismissals. In *IT Group* for example:

> Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company.... Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed....
>
> ... [D]efendant DeLuca was a director and an officer.... Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim....

*IT Group,* 2005 WL 3050611, at *13, 2005 U.S. Dist. LEXIS 27869, at *41–42.

The District Court dismissed a claim similarly lacking in facts in *Edgecomb.*

> The Complaint only mentions Sciarillo directly two times. First, it states that when Messing took control of Star, Sciarillo was made CFO, and, second, it contends that Sciarillo assisted Messing with the sale of PT–1 to IDT. With respect to the other actions in which Messing participated, the Complaint frequently uses the term "his team," which presumably includes Sciarillo. The Plaintiff does not allege that Sciarillo received an improper benefit from any of the transactions in which the Plaintiff alleges he participated, or that he was interested in the transactions in any other way. In fact, the only mention of Sciarillo in the Plaintiff's Opposition to the Defendants' Motion to Dismiss is that "[d]efendants Crumly and Sciarillo also participated in the IDT transaction

as officers, though further discovery is required to establish the extent of their involvement." Consequently, the Plaintiff has failed to plead any facts to support a claim that Sciarillo breached his fiduciary duty of loyalty. Nor does it adequately plead a duty of care or gross negligence claim, and, if it did, the § 102(b)(7) charter provision would prevent such claims.

*Edgecomb,* 385 F.Supp.2d at 466 (footnotes and citations omitted).

Moreover, in addition to the fact that the Complaint fails to identify any offending acts the Count III/IV Defendants took in their capacities as officers, in fact, for the most part, the acts of which the Trust complains were entrusted to directors, and not officers, by statute. Section 271 of the Delaware General Corporation Law provides, in pertinent part, that

> [e]very corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets . . . .

Consequently, since making the Assets sale decision was not the officers' authority, I cannot understand how the Count III/IV Defendants could have violated any fiduciary duty allegedly owed as officers.

The one difference in the Challenged Actions found in Counts III and IV, as compared with Count II, is that Counts III and IV assert that the Count III/IV Defendants "breached their fiduciary duty of care as officers by engaging in a sustained and systemic failure to exercise reasonable oversight over Defendant Ramaekers." (Complaint, ¶¶ 122, 130.) This allegation does not salvage Counts III and IV.

This language originated in *Caremark* and this type of claim is known as a "Caremark claim." *Stone,* 911 A.2d at 364. However, this language is used out of context in Counts III and IV.

The Complaint purports to assert a charge of "sustained and systemic failure of oversight" only in the claims against the Count III/IV Defendants in their capacities as officers. However, under Delaware law, this theory of liability typically applies to directors, and not to officers.

> The *Caremark* decision stands for the proposition that, corporate *directors,* who must approve major corporate transactions, are not required to be intimately involved in routine daily business operations. Further, unless the *board* has reason to suspect wrongdoing, it will not be liable for an employee's misconduct. However, the court held that the *board* must implement an information and reporting system which "is in concept and design adequate to assure the *board* that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." Without such a system, the *board,* in theory, may be found liable for breach of fiduciary duty. According to the court, the *board's* lack of good faith in establishing a compliance program will be proven if there is "a sustained or systematic failure of the *board* to exercise oversight."

*Cantor v. Perelman,* 235 F.Supp.2d 377, 389 (D.Del.2002) (emphasis added); *see also, Stone,* 911 A.2d at 368–69. Accordingly, the allegations in Counts III and IV do not provide a sufficient basis for liability.

It cannot be said that generic corporate officers have a duty to oversee a company's chief operating officer, which is the position Ramaekers held. For example, it is not the responsibility of a company's vice president of marketing or a company's general counsel to oversee the actions of the chief operating officer in implementing

a business strategy. Selling the Assets was squarely within the scope of strategies Ramaekers was hired to execute. It was highly unlikely that it was the responsibility of other officers to oversee, supervise or second-guess Ramaekers' performance of his job.

In its opposition, the Trust relies on *Enivid* where the court denied the motion to dismiss, as involving conduct comparable to Counts III and IV. According to the Trust, in *Enivid*, "the plaintiff brought a separate cause of action against the debtor's officers for breach of fiduciary duty of care. The court denied the defendant's motion to dismiss an d did not require the plaintiff to plead its claim with the extreme specificity that the D & O Defendants think should be required here." (Doc. # 31, pp. 49–50.)

I find the complaint in *Enivid* to be quite different from the Complaint here. The *Enivid* complaint was 113 pages long with 411 paragraphs. 345 B.R. at 440. More importantly, the *Enivid* opinion set forth the complaint allegations in considerable detail as to the conduct of the subject officers, including (1) the positions held by the three defendant officers, (2) the numerous exchanges of e-mails and memoranda between the officers and memoranda from the officers to the board of directors, (3) the relevant board directors' minutes and (4) numerous oral communications among the officers and the directors. *Id.* at 440–41. The *Enivid* decision did not identify the allegations of breach of care as group allegations. To the contrary, the *Enivid* opinion analyzed the claims allegations officer by officer. *Enivid*, 345 B.R. at 451–52. Unlike the Complaint, for each officer in *Enivid*, the complaint alleged actions and inactions to show that the officer failed to satisfy the duty of care, through concealment of material facts from the board of directors

and other intentional disregard of his responsibilities. *Id.* at 451–52. No such allegations appear in the Complaint. In short, the complaint in *Enivid* presented the kinds of detailed facts not found in the Complaint.

According to the Trust, "these defendants breached their fiduciary duty of care and did not act in good faith by virtue of their acts and omissions and in connection with the fire-sale of the Transferred Assets." (Doc. # 31, p. 48.) It is important to keep in mind that at this point we are addressing just two allegations of wrongdoing by the Count III/IV Defendants: (1) that they abdicated crucial decision-making authority to Ramaekers and (2) they failed to adequately supervise him in effecting the sale transaction with CDW. The abdication assertion as to the board of directors is easy to understand. But as to Ramaekers, the Chief Operating Officer, his relationships and dealings with the other officers is not easy to understand in an "abdication" context as asserted in Counts III and IV. Indeed, it is simply not possible to understand it. There is nothing in the Complaint to suggest that any of the other officers had supervisory authority over Ramaekers, the Chief Operating Officer. Indeed, one would assume that with a conventional chain of command in a corporation the opposite would be true, that is, that the chief operating officer would have some supervisory authority over at least some of the other officers. Nowhere in the Complaint does it allege any specific exchange of views as between Ramaekers and the other officers regarding the conduct of the sale of Assets.

The Complaint is too short on facts regarding the conduct of the officers in pursuing the sale transaction to survive the motion to dismiss Counts III/IV. Therefore, I will grant the motion to dismiss Counts III/IV. This dismissal is without

prejudice to the Plaintiff in filing within 30 days an amended complaint if it can adequately plead facts to satisfy the pleading standard set forth in *Twombly.*

## Count V—Ramaekers Breach of Fiduciary Duties

 It seems to me that this separate Count as to Ramaekers is essentially a repeat of Counts I and II as to the other defendants. Presumably, it is in the Complaint as a separate count because Ramaekers was different from the other directors. As alleged in the Complaint: "By virtue of his unique experience with financially-distressed companies, Defendant Ramaekers was required to draw on that experience in making key business decisions and fulfilling his fiduciary duty of care. Defendant Ramaekers failed to do so, in violation of his fiduciary duty of care." (Complaint, ¶ 137.) For that reason and for the reasons stated above with respect to Counts I and II, I will deny Ramaekers motion.

In his motion to dismiss Count V, Ramaekers makes an argument not made by the D & O Defendants, namely, that the Complaint as to him does not show proximate cause. That is, because the board of directors approved the sale transaction, the result of the transaction was not caused by Ramaekers. This position ignores the fact that the Complaint repeatedly asserts that the board of directors abdicated in favor of Ramaekers. This allegation could easily lead to the conclusion that Ramaekers caused the transaction to be approved and effected.

In his motion, Ramaekers appropriately points out that the Complaint acknowledges that when Ramaekers came on board, Micro Warehouse was in financial crisis. It may well be that at the end of the day the D & O Defendants and Ramaekers will produce facts which will demonstrate that the sale transaction was the best that could be obtained under the circumstances. However, at this stage of the proceeding we have the underlying inescapable fact that for a sale price of $28,000,000 CDW purchased Assets which at the time of the transaction it valued at $126,000,000. The financial community effectively characterized the transaction as a "steal" for CDW. And of course, CDW has now paid the estate an additional $25,000,000 to avoid a trial on the fraudulent conveyance action. Did CDW just get lucky in its purchase or did the D & O Defendants and Ramaekers wrongly allow CDW to dupe the Company? As previously noted above, the Assets sale was clearly a failed transaction from the point of view of Micro Warehouse and at this stage of the proceeding I am reluctant to preclude the Trust from seeking a remedy if the failed transaction was the result of wrongful conduct by the D & O Defendants and/or Ramaekers.

## Count VI—Corporate Waste

 To succeed in proving waste, a plaintiff must plead facts showing " 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate considerations.' "[sic]

*Elkins,* 2004 WL 1949290, *17, 2004 Del. Ch. LEXIS 122, *65.

As stated by the Delaware Supreme Court in *Disney,*

A claim of waste will arise only in the rare, "unconscionable case where directors irrationally squander or give away corporate assets." This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it

cannot be "attributed to any rational business purpose."

*Disney,* 906 A.2d at 74 (citations omitted). ■ The Complaint here does not allege facts that support the conclusion that no reasonable person would find $28 million adequate for the Assets of a failing entity. Only extraordinary circumstances can justify a finding of waste and the Complaint here does not present those circumstances.

> Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex post,* to judge appropriate degrees of business risk.

> To be sure, there are outer limits, but they are confined to unconscionable cases where directors irrationally squander or give away corporate assets.

*Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000)(italics in original; citations omitted). In *Disney,* the Delaware Supreme Court emphasized that there is a "high hurdle required to establish waste," *Disney,* 906 A.2d at 75, and that case exemplifies how extraordinarily high that hurdle is. The *Disney* court ruled that, as extravagant as it was to pay Mr. Ovitz $130 million in severance after one year of underperforming employment, the Ovitz

deal had a "rational business purpose," and thus could not constitute corporate waste. *Id.* Here, viewed against the Company's downward spiraling financial condition alleged in the Complaint, I am unable to conclude that selling the Assets for $28 million had no rational basis.

The Trust relies upon a number of Delaware Supreme Court and Chancery Court cases in support of its position, namely, *Benerofe v. Cha,* No. 14614, 1998 WL 83081 (Del.Ch. Feb.20, 1998); *Brehm,* 746 A.2d 244; *Stone,* 911 A.2d 362; *Telxon Corp. v. Bogomolny,* 792 A.2d 964 (Del.Ch. 2001); *In re National Auto Credit, Inc. S'holders Litig.,* No. 19028, 2003 WL 139768 (Del.Ch. Jan.10, 2003); and *In re TEU Holdings, Inc.,* 287 B.R. 26 (Bankr. D.Del.2002). I find none of those cases to be helpful to the Trust's position.

The Trust quotes from *Stone* to the following effect:

> Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

911 A.2d at 370. The *Stone* decision is factually inapposite and the quoted statement is taken out of context. The *Stone* decision involved a derivative action against directors for failing to supervise bank employees who were obligated to file suspicious activity reports in compliance with various federal anti-money laundering regulations. The Delaware Supreme Court affirmed the Chancery Court dismissal of the complaint and stated the applicable legal proposition as follows:

> We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or con-

trols; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

*Id.* at 370. That proposition is not applicable here.

The Trust cites the Delaware Supreme Court's decision in *Brehm* for the proposition that "a waste claim will survive a motion to dismiss where it is unclear that there was 'any substantial consideration' or 'good faith judgment' by the board that the compensation was worthwhile." (Doc. # 31, p. 55.) I had considerable difficulty identifying that proposition in the *Brehm* opinion. In any event, I find the *Brehm* case to be factually inapposite. That case involved the notoriously generous compensation package given to Mr. Ovitz by the Walt Disney company, as to which at the end of the long litigation process the Supreme Court found no corporate waste.

*Telxon* likewise is factually inapposite. The multi-count complaint in that case centered around a board of directors action in granting a generous stock option to the chairman of the board. *See Telxon*, 792 A.2d at 971. I find the *Telxon* decision to be not helpful in assessing the corporate waste count in this Complaint.

The Trust cites *Benerofe* as an example of where the Chancery Court refused to dismiss a claim of corporate waste where the corporation sold its products at less than open market prices. However, the facts in *Benerofe* are quite different from the facts here. Specifically, in *Benerofe* the complaint alleged "that ICI sold its products to KSP at prices less than it was able to obtain in the open market for similar products and similar quantities." *Benerofe*, 1998 WL 83081, at *4. However, the opinion points out that KSP controlled 59% of ICI's outstanding shares and had

the right to elect two of ICI's three directors, thus providing KSP with voting control of ICI. *See id.* No such similar control relationship is alleged to have existed between CDW and Micro Warehouse. Indeed, the record abundantly suggests that CDW and Micro Warehouse were competitors with no relationship that would support a suggestion of director self-interest.

*National Auto Credit, Inc.* is also not helpful to the Trust's cause. In that case, the count of corporate waste related to "a series of inter-related transactions that furthered [certain officers and directors] interests at the expense of all other [corporate] shareholders." *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *6. There is no self-interest behavior alleged here.

Finally, in *TEU Holdings, Inc.* the court denied the motion to dismiss the corporate waste count in a situation where the officer and director defendants caused the corporation to expend $2,000,000 for an integrated logistics system that "was wholly lacking in value...." *In re TEU Holdings, Inc.*, 287 B.R. at 34. Thus, the court found that the difference between $2,000,000 and $0 was "sufficiently unusual" to allow the claim to proceed. The facts here are quite different.

Thus, Count VI will be dismissed.

## CONCLUSION

For the reasons discussed above, the D & O Defendants' motion to dismiss the Complaint (Doc. # 16) and the Ramaeker's motion to dismiss the Complaint (Doc. # 17) are denied in part and granted in part as follows:

(1) To the extent that the Complaint asserts four separate "Challenged Actions", two of those actions, namely, failing to put the Company up for sale earlier and

failing to hire a restructuring advisor earlier in 2003, are barred by the three year statute of limitations (10 Del. C. § 8106).

(2) The D & O Defendants' motion is denied as to Count I.

(3) To the extent that Count I and Count II assert liability against defendant Midler in his capacity as a director, the D & O Defendants' motion is granted.

(4) The D & O Defendants' motion is denied as to Count II.

(5) The D & O Defendants' motion is granted as to Counts III and IV, provided that the Plaintiff shall have 30 days to file an amended complaint if it can adequately plead facts to satisfy the pleading standard set forth in *Bell Atlantic v. Twombly,* 550 U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

(6) Ramaekers' motion is denied as to Count V.

(7) The D & O Defendants' motion is granted as to Count VI.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the D & O Defendants' motion to dismiss the Complaint (Doc. # 17) and the Ramaeker's motion to dismiss the Complaint (Doc. # 16) are denied in part and granted in part as follows:

(1) To the extent that the Complaint asserts four separate "Challenged Actions", two of those actions, namely, failing to put the Company up for sale earlier and failing to hire a restructuring advisor earlier in 2003, are barred by the three year statute of limitations (10 Del. C. § 8106).

(2) The D & O Defendants' motion is denied as to Count I.

(3) To the extent that Count I and Count II assert liability against defendant Midler in his capacity as a director, the D & O Defendants' motion is granted.

(4) The D & O Defendants' motion is denied as to Count II.

(5) The D & O Defendants' motion is granted as to Counts III and IV, provided that the Plaintiff shall have 30 days to file an amended complaint if it can adequately plead facts to satisfy the pleading standard set forth in *Bell Atlantic v. Twombly,* 550 U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

(6) Ramaekers' motion is denied as to Count V.

(7) The D & O Defendants' motion is granted as to Count VI.